# NO. 22-2629

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

TRAVIS WOODS, an individual,

Plaintiff – Appellant,

v.

CENTRO OF ONEIDA, INC., CENTRAL NEW YORK
REGIONAL TRANSPORATION AUTHORITY,

Defendant – Appellee,

CITY OF UTICA,

Defendant.

On Appeal from the United States District Court, Northern District of New York,
No. 6:20-cv-00539, Honorable Frederick J. Scullin, Presiding

**OPENING BRIEF OF APPELLANT**

**BIZER & DEREUS, LLC**
ANDREW D. BIZER
GARRET S. DEREUS
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999
*Attorneys for Plaintiff-Appellant Travis Woods*

i

## **TABLE OF CONTENTS**

TABLE OF CONTENTS………………………………………………………..ii

TABLE OF AUTHORITIES…………………………………………………iv

STATEMENT REGARDING ORAL ARGUMENT……………………………...1

STATEMENT OF JURISDICTION……………………………………………….2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW…………………3

STATEMENT OF THE CASE……………………………………………………4

SUMMARY OF THE ARGUMENT………………………………………………..14

ARGUMENT……………………………………………………………………...16

   A.   STANDARD OF REVIEW ......................................................................16

   B.   MR. WOODS HAS ARTICLE III STANDING.........................................16

   C.   THE DISTRICT COURT ERRED BY FAILING TO RECOGNIZE THAT DISCRIMINATION UNDER TITLE II OF THE ADA, PART B, INCLUDES BOTH ALTERATION STANDARD VIOLATIONS AND PROGRAM ACCESS VIOLATIONS ......................................................19

   D.   THE DISTRICT COURT ERRED BY CREATING A NEW RULE THAT TRANSPORTATION PROVIDERS NEED NOT MAKE THEIR FIXED ROUTE BUS SYSTEM ACCESSIBLE IF THEY PROVIDE PARATRANSIT ........................................................................................28

      1)  Paratransit is Intended to Serve as a Complement to an Accessible Fixed Route Bus System, Not as a Substitute for Accessible Fixed Route Service.......................................................................................28

      2)  A Transportation Provider's Programs and Services Must be Evaluated Separately ............................................................................................35

      3)  The Department of Transportation's Regulations Firmly Establish that Individuals with Disabilities Are Entitled to Request Reasonable Accommodations as to a Fixed Route Bus System ..............................39

4) Whether Centro Had an "FTA-Approved" Paratransit Plan Was Legally Immaterial ................................................................................42

E. THE DISTRICT COURT ERRED IN HOLDING THAT CENTRO'S USE OF INTERSECTIONS AND COMMERCIAL DRIVEWAYS PROVIDED MR. WOODS WITH "MEANINGFUL ACCESS"..............44

CONCLUSION ………………………………………………………..48

CERTIFICATE OF SERVICE………………………………………………50

CERTIFICATE OF COMPLAINCE………………………………………...50

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Beckford v. Portuondo*,
    234 F.3d 128 (2d Cir.2000) ..................................................... 26, 44

*Brooklyn Ctr. for Independence of the Disabled v. Metro. Transp. Auth.*,
    11 F.4th 55 (2d Cir. 2021) ................................................ 31, 32, 33

*Celeste v. E. Meadow Union Free Sch. Dist.*,
    373 Fed.Appx. 85 (2d Cir. 2010)....................................................46

*Chapman v. Pier 1 Imps. (U.S.) Inc.*,
    631 F.3d 939 (9th Cir. 2011) ........................................................45

*City of Arlington, Tex. v. F.C.C.*,
    569 U.S. 290 (2013).......................................................................42

*Cohen v. City of Culver City*,
    754 F.3d 690 (9th Cir. 2014) ........................................................22

*Disabled in Action of Metro. N.Y. v. Trump Int'L Hotel & Tower*,
    2003 WL 1751785, (S.D.N.Y. Apr. 1, 2003) ...............................17

*Dotson v. City of Syracuse*,
    688 F. App'x 69, 72 (2d Cir. 2017) ....................................... 26, 44

*Falls v. Bd. of Commissioners of New Orleans Reg'l Transit Auth.*,
    2017 WL 2730781 (E.D. La. June 26, 2017) ...............................23

*Frame v. City of Arlington*,
    657 F.3d 215 (5th Cir. 2011) ................................................. 22, 36

*Hamer v. City of Trinidad*,
    441 F. Supp. 3d 1155 (D. Colo. 2020) .........................................36

*Hamer v. City of Trinidad*,
924 F.3d 1093 (10th Cir. 2019) ....................................................20

*Johnson v. City of Saline*,
151 F.3d 564 (6th Cir.1998) ..........................................................36

*Kreisler v. Second Ave. Diner Corp.*,
731 F.3d 184 (2d Cir. 2013) ................................................. 17, 18

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
192 F.3d 337 (2d Cir.1999) ...........................................................16

*Liu v. U.S. Congress*,
834 F. App'x 600 (2d Cir. 2020) ...................................................16

*Mackey v. Lanier Collection Agency & Service, Inc.*,
486 U.S. 825 (1988)........................................................................43

*Mario v. P & C Food Markets, Inc.*,
313 F.3d 758 (2d Cir.2002) ...........................................................16

*Melton v. Dallas Area Rapid Transit*,
391 F.3d 669 (5th Cir. 2004) .................................... 27, 31, 39, 40

*Miller v. Wolpoff & Abramson, L.L.P.*,
321 F.3d 292 (2d Cir. 2003) .........................................................16

*Noll v. Int'l Bus. Machines Corp.*,
787 F.3d 89 (2d Cir. 2015) ............................................................47

*Oconomowoc Residential Programs v. City of Milwaukee*,
300 F.3d 775 (7th Cir. 2002) .........................................................46

*Orchano v. Advanced Recovery, Inc.*,
107 F.3d 94 (2d Cir.1997) .............................................................26

v

*Panzica v. Mas – Maz, Inc.*,
    2007 WL 1732123 (E.D.N.Y. June 11, 2007)................................................17

*Pennsylvania Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998)..............................................................................35

*Perdum v. Forest City Ratner Cos.*,
    174 F.Supp.3d 706 (E.D.N.Y. 2016) ............................................................18

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001)........................................................................... 36, 37

*Pickern v. Holiday Quality Foods, Inc.*,
    293 F.3d 1133 (9th Cir. 2002) .....................................................................17

*Poway Unified Sch. Dist. v. K.C. ex rel. Cheng*,
    2014 WL 129086 (S.D. Cal. Jan. 14, 2014) ...............................................46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    132 S.Ct. 2065 (2012).............................................................................27

*Roberts v. Royal Atl. Corp.*,
    542 F.3d 363 (2d Cir. 2008) .................................................................. 22, 27

*Sarfaty v. City of Los Angeles*,
    2020 WL 4697906 (C.D. Cal. Aug. 12, 2020) .............................................46

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004) .......................................................................17

*Shariff v. Radamar Meat Corp.*,
    2014 WL 1311563 (E.D.N.Y. Feb. 14, 2014) .............................................18

*Small v. Gen. Nutrition Cos*,
    388 F.Supp.2d 83 (E.D.N.Y. 2005) ............................................................18

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..................................................................16

*U.S. Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002)......................................................................48

*United States v. Clark*,
    454 U.S. 555 (1982)......................................................................38

*United States v. Jicarilla Apache Nation*,
    131 S.Ct. 2313 (2011)..................................................................43

*Velazco v. Columbus Citizens Found.*,
    778 F.3d 409 (2d Cir.2015) ........................................... 26, 27, 44

*Wernick v. Fed. Rsrv. Bank of New York*,
    91 F.3d 379 (2d Cir. 1996) ..........................................................47

*Wright v. Bd. of Commissioners of Cap. Area Transit Sys.*,
    2022 WL 17574078 (M.D. La. Dec. 9, 2022) ..............................22

*Wright v. New York State Dep't of Corr.*,
    831 F.3d 64 (2d Cir. 2016) ........................................... 29, 46, 48

## **Statutes**

29 U.S.C. § 794..............................................................................21

42 U.S.C. § 12101 ............................................................. 29, 38, 48

42 U.S.C. § 12147..........................................................................27

42 U.S.C. § 12148 ................................................................. 21, 27

42 U.S.C. § 12188..........................................................................17

## Other Authorities

*36 CFR Parts 1190 and 1191 Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities; Architectural Barriers Act (ABA) Accessibility Guidelines; Final Rule*, Friday, July 23, 2004, Federal Register, Vol 69, No 141 ...................................................................................47

ADA: Guidance, 2015 WL 6037995 ................................................................ 15, 30

*Americans with Disabilities Act of 1988: Oversight Hearing on H.R. 4498 Before the Subcommittee on Select Education of the House Committee on Education and Labor*, 100th Cong. (1988) ...........................................................................39

H.R. REP. 101-485, 23, 84, as reprinted in 1990 U.S.C.C.A.N. 303 ......................38

*Transportation for Individuals With Disabilities; Reasonable Modification of Policies and Practices*, Department of Transportation, 80 FR 13253-01, 2015 WL 1066826(F.R.) ........................................................................ 41, 44

Transportation for People With Disabilities, 56 Fed.Reg. (Sep. 6, 1991)...............30

## Regulations

28 C.F.R. § 37 ................................................................... passim

28 C.F.R. § 37.123 ..................................................................29

49 C.F.R. § 37 ....................................................................25

49 C.F.R. § 37.43 .................................................................23

## STATEMENT REGARDING ORAL ARGUMENT

Travis Woods has paraplegia and uses a wheelchair for mobility. Mr. Woods sued his local public transit provider because the bus stops serving the fixed route bus system are systemically inaccessible. An overwhelming majority of the bus stops in the City of Utica do not contain safe concrete landing pads for Mr. Woods to use to board and alight the busses. The district court dismissed Mr. Woods' claims of disability discrimination at the summary judgment stage. The district court erred by failing to recognize that discrimination under Title II of the Americans with Disabilities Act, Part B, includes the failure to provide program access and the failure make altered facilities accessible to individuals with disabilities. The district court held that Utica's public transportation provider is not obligated to make its fixed route bus system accessible because it provides paratransit service[1]. This ruling establishes a "separate but unequal" system where public transportation providers can relegate wheelchair users to paratransit, a clearly inferior transportation service. If the district court's holding stands, transportation entities will be obviated from providing an accessible fixed route bus system if they also provide a paratransit service. This Court's ruling on Mr. Woods' claims will define the legal contours for

---

[1] As is explained in greater detail *infra*, paratransit is a form of transportation for people with disabilities who are unable to use the regular, fixed route bus system. Paratransit usually provides door-to-door service for people who call a day in advance to reserve a ride and does not provide for spur of the moment use.

accessible fixed route bus systems in the Second Circuit. This Court's ruling will impact the lives of tens of thousands of individuals with disabilities.

In accordance with F.R.A.P. 34(2), oral argument should be permitted as Mr. Woods' appeal is not frivolous, the dispositive issues have not been authoritatively decided, and the facts and legal arguments are adequately presented in the briefs and the record. Oral argument would significantly facilitate the outcome of this matter. Accordingly, Mr. Woods respectfully requests oral argument.

## STATEMENT OF JURISDICTION

The district court issued a final judgment dismissing all of Mr. Woods' claims on September 19, 2022. Mr. Woods brought suit under federal law. On September 29, 2022, pursuant to Rule 4(a)(1)(A), Mr. Woods filed a timely Notice of Appeal.

Because the district court's judgment was a final judgment, this Court has jurisdiction under 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

The following issues are currently before the Court:

1.      Title II of the Americans with Disabilities Act, Part B, outlines various kinds of prohibited discrimination including: (1) failure make alterations such that the altered facilities are readily accessible to and usable by individuals with disabilities; (2) failure to provide "program access;" and (3) failure to provide a reasonable accommodation. Was the district court obligated to assess the evidence and argument presented by Mr. Woods as to each of his three theories of liability?

2.      Under Title II of the Americans with Disabilities Act, Part B, are transportation entities obviated from making their fixed route bus system accessible if they also provide paratransit service?

3.      In lieu of making their fixed route bus system accessible, the defendants proposed that they could pick up and drop off Mr. Woods and other wheelchair users in commercial driveways and on curb cuts with unknown slopes and conditions. Was this proposal "plainly reasonable" such that defendants were entitled to summary judgment in their favor on Mr. Woods' reasonable accommodation claim?

## STATEMENT OF THE CASE

Travis Woods filed suit against the public transportation provider in his hometown of Utica, New York alleging violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*. ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794 ("RA"). The case was assigned to the Honorable Judge Frederick J. Scullin, Jr. Following discovery, and after briefing by the parties, the district court entered summary judgment in favor of the defendants. Final judgment was entered and Mr. Woods filed a timely notice of appeal. Under the Clerk of Court's Scheduling Order, Mr. Woods' opening brief must be filed on or before February 3, 2023. This timely brief now follows.

Mr. Woods resides in Utica, New York and has paraplegia. R.A.18. Mr. Woods uses a wheelchair for mobility. R.A.19. Centro of Oneida, Inc. and Central New York Regional Transit Authority (hereinafter and collectively referred to as "Centro") operate the bus system in Utica. R.A.19.

Mr. Woods independently travels around Utica and is aware of the lack of safe, accessible landing pads that plague Centro's fixed route bus system. R.A.81.[2] While able-bodied citizens of Utica are free to catch the bus at a moment's notice,

---

[2] For many of the factual citations, such as this one, Mr. Woods cites to the *Statement of Material Facts* he filed into the record as part of the summary judgment briefing. In that pleading, Mr. Woods outlined various facts and cited specific evidence that was concurrently filed into the record.

Mr. Woods cannot because ninety-one (91%) percent bus stops in Utica are dangerously inaccessible, despite each bus stop sign bearing the words "ACCESSIBLE STOP" along with the international symbol accessibility. R.A.19-20,85-86.



The lack of accessible landing pads has deterred, and is currently deterring, Mr. Woods from using the fixed route bus system in Utica. In his deposition, Mr. Woods summed the problem up succinctly:

> "There's no landing pad…you have to have one there. There's nothing there but danger. That's what you get from all these bus stops. That's why I can't continue on getting on the bus stop. If the bus stops was correct for me to get on there, I would continue on." R.A.82.

According to Mr. Woods, "the bus stops are like distant islands. You can't get to it." R.A.82.

Frustrated by the bus stops that were completely lacking landing pads, Mr. Woods attempted to engage in a dialogue with Centro to remedy the inaccessible bus stops. On April 3, 2020, Mr. Woods sent Centro a written request for reasonable accommodation. R.A.20. Mr. Woods advised Centro of the widespread inaccessibility of the landing pads and requested that the barriers be remedied. R.A.20. Mr. Woods' request for a reasonable accommodation ended up on the desk of Joshua Gardener, the Centro's ADA Complaint Officer. R.A.83. Upon receipt of Mr. Woods' request, Mr. Gardener did not examine the bus stops to see if landing pads existed or if they were the proper dimensions. R.A.83-84. In his deposition, Mr. Gardener offered a legal opinion that not all stops have to have landing pads because they were "grandfathered in." R.A.84. After doing next to no research to confirm or deny Mr. Wood's claims of "widespread noncompliance with the ADA," on April 20, 2020, Mr. Gardener responded:

> "We have received your ADA complaint regarding accessible landing pads at specific bus stops in Utica. At a few of these sites, there are curb cuts within feet of the bus stop where drivers can put the ramp down and allow for safe entering and exiting of the vehicle. At a few of the other locations, there are no sidewalks. In cases like these, drivers can drop off at the driveway entrance of the location. For example, at Parkway Drugs there is no sidewalk. At this location, we can have the driver stop at the driveway entrance to let you off. We also allow for courtesy stops

along the route. If you would like to be dropped off somewhere other than the stop, please ask the driver when boarding the vehicle. If there are no safety issues present, we will accommodate courtesy stops." R.A.84-85.

Rather than take steps to make their fixed route bus system accessible, Centro responded to Mr. Woods by suggesting that he should endanger his life and limb by boarding and alighting buses in commercial driveways and on curb cuts with unknown slopes. Centro did not take any steps to provide Mr. Woods with a reasonable accommodation.

Unsatisfied with Centro's dangerous suggestion that he depart the busses in active driveways and on sloped curb cuts, Mr. Woods sued Centro in the United States District Court for the Northern District of New York, alleging that it had violated the ADA and RA by failing to provide bus stops that were accessible to individuals with mobility-related disabilities. R.A.19. The nexus of Mr. Woods' case is that Centro committed discrimination in three different ways: (1) by failing to make alterations such that the altered facilities are readily accessible, (2) by failing to provide "program access," and (3) by failing to provide a reasonable accommodation. The parties conducted discovery and counsel for Mr. Woods commissioned an expert inspection of the bus stops in Utica. R.A.85. Based on an objective sampling of the bus stops, Mr. Woods' expert determined that **91% of the bus stops inspected do not meet the technical specifications for accessibility.** R.A.85-86. Mr. Woods' expert further opined that, based on the high percentage of

non-compliance observed, it was his opinion that the fixed route bus system, when viewed in its entirety, does not meet the design and scoping standards of the ADA. R.A.85-86. Without question, Centro's bus stop system is plagued with physical barriers that renders the bus stops inaccessible to wheelchair users.

Centro hired its own expert who did not dispute any of the measurements taken in Mr. Woods's inspection. R.A.86. Instead, Centro's expert opined that when wheelchair users encounter a bus stop without a landing pad, they should board and alight in intersections and driveways. R.A.87. Centro's expert did not take any measurements of those driveways and intersections to determine whether they are safe or if they contained excessive slopes, debris, or uneven changes in level – all of which would make them unsafe and therefore unreasonable places to pick up and drop off a wheelchair user. R.A.87.

Centro's expert agreed that the purpose of the ADA is so that people with disabilities can get access in a safe manner. R.A.87. Centro's expert agreed that the ADA Accessibility Guidelines ("ADAAG") contain specific measurements of architectural features to ensure safety. R.A.88. Centro's expert agreed that one reason the ADAAG requires landing pads to be flat is because "we don't want wheelchair users either tipping over because it is too steep or rolling around when they take their hands off their wheels for a second." R.A.88. Centro's expert agreed that if a wheelchair user attempts to "eyeball" an area for safety, it is possible that

9

the wheelchair user's eyeballs can deceive them and they could disembark on a dangerously steep slope. R.A.88.

Mr. Woods secured evidence that Centro had altered the bus stops by redesignation/remapping the stops and installing signs bearing the words "ACCESSIBLE STOP" along with the international symbol accessibility. R.A.89.

Mr. Woods and Centro filed cross motions for summary judgment. In his brief, Mr. Woods argued that Centro committed discrimination by (a) failing to ensure that the altered facilities were readily accessible to and usable by individuals with disabilities, (b) failing to provide "program access," and (c) failing to provide a reasonable accommodation. R.A.48. Mr. Woods argued that, under the Supreme Court case of *Pennsylvania Dep't of Corr. V. Yeskey*, a public entity must ensure that it does not commit discrimination as to <u>each</u> of its programs, services, and activities – meaning that both Centro's fixed route bus system <u>and</u> its paratransit service must be accessible to wheelchair users. R.A.65.

In contrast, Centro's primary arguments were (1) that Mr. Woods did not have Article III standing; (2) that the inaccessible nature of the fixed route bus system was obviated by providing a paratransit system; and (3) that Mr. Woods did not need accessible bus stops because he and other wheelchair users could board or alight the buses in driveways and on curb cuts.

Mr. Woods put forth evidence concerning his standing. Mr. Woods responded to Centro's "paratransit defense" by explaining that Congress did not intend for paratransit to be used a substitute to providing an accessible fixed route bus system. R.A.65-69. Mr. Woods argued that paratransit is a supplemental service intended for the infirm, the elderly, and individuals whose disabilities are so severe that they cannot otherwise use the accessible fixed route bus system. R.A.65-69. Mr. Woods also provided factual evidence of the significant and material differences between paratransit service and fixed route bus system, such as the inability to engage in independent and spontaneous transportation via paratransit because of the need for advanced reservations. R.A.66. Finally, as to Centro's "use commercial driveways" argument, Mr. Woods responded that this so-called "accommodation" was unreasonable and ineffective because (1) it puts individuals with disabilities at risk of getting hit by vehicular traffic; and (2) commercial driveways and curb cuts contain unknown slopes and potentially dangerous conditions.[3]

On September 19, 2022, the district court granted Centro's motion for summary judgment and denying Mr. Woods' motion for summary judgment. However, the court found that Mr. Woods had standing to pursue his claims.

---

[3] *See* R.A.64. ("Here, the only 'non-structural' alternative Defendants can point to is the wholly unreasonable proposal that bus drivers drop Mr. Woods off in active commercial driveways where he is at risk of getting hit by a car."); *see also* R.A.85-88.

The district court did not engage with any of Mr. Woods' three individual claims (alteration requirement, program access requirement, and reasonable accommodation requirement) and, instead, performed a single, generalized assessment of whether Mr. Woods had "meaningful access."[4] The district court performed no assessment as to whether Centro had violated the "alteration" or "program access" requirements of the ADA.

The district court outlined several legal conclusions in support of its holding. In its generalized "meaningful access" assessment, the district court acknowledged that reasonableness is often a "fact intensive" question, and that a defendant is only entitled to summary judgment on reasonableness if it has afforded the plaintiff a "plainly reasonable accommodation." R.A.25. The district court rejected Mr. Woods' argument that a public entity must ensure that <u>each</u> of its transportation services are accessible. R.A.27. Instead, the district court held that Mr. Woods was entitled to nothing more than paratransit, establishing a "separate but unequal" system of public transportation wherein wheelchair users are segregated to paratransit, a clearly inferior transportation service. The district court reasoned that "a paratransit system can be a reasonable accommodation that provides 'meaningful access' to an otherwise-inaccessible transit system…" R.A.27. The district court

---

[4] *See* R.A.24-25. (Nowhere in the district court's opinion did the court assess Mr. Woods' claims based on the alteration standard or the program access standard. <u>In fact, the word "alteration" does not appear once in the district court's opinion</u>.)

held that Centro's paratransit system was a "plainly reasonable accommodation to Defendants' allegedly inaccessible fixed route bus system." R.A.28.

Finally, tucked away in a footnote, with no analysis or explanation, the district court held that Centro's use of commercial driveways and curb cuts as "alternative" pick up and drop off locations (in lieu of accessible bus stops with safe, flat, and stable landing pads) is sufficient to provide Mr. Woods with "meaningful access". R.A.30, fn7. The district court provided no explanation as to how commercial driveways and curb cuts are a safe or effective location for wheelchair users to board and alight busses. This holding is especially concerning because Mr. Woods testified in his deposition that he was once dropped off in a McDonald's driveway that contained a slope so excessive that he was not able to independently get out of the driveway without the assistance of his friend. R.A.81. Ignoring evidence that dropping off wheelchair users in active driveways is not effective or safe, the district court held that this "accommodation" was plainly reasonable and provided Mr. Woods with "meaningful access."

Final judgment was entered in favor of Centro on September 19, 2022. R.A.15. On September 29, 2022, pursuant to Rule 4(a)(1)(A), Mr. Woods filed a timely Notice of Appeal in the United States District Court for the North District of New York. R.A.13. Under the Clerk of Court's Scheduling Order, Mr. Woods'

opening brief must be filed on or before February 3, 2023. Now, Mr. Woods files this timely opening brief in support of his appeal.

## SUMMARY OF THE ARGUMENT

The district court committed three separate legal errors.

*First*, the district court failed to evaluate Mr. Woods' claims under the alteration requirement and the program access requirement. Title II of the ADA, Part B, outlines various kinds of prohibited discrimination including: (1) failure make alterations such that the altered facilities are readily accessible to and usable by individuals with disabilities; (2) failure to provide "program access;" and; (3) failure to provide a reasonable accommodation. Mr. Woods put forth evidence that Centro committed discrimination by violating the alteration requirement, the "program access" requirement, and the reasonable accommodation requirement. The district court completely failed to assess whether Centro violated the alteration requirement or program access requirement and, instead, held that Mr. Woods was solely entitled to the paratransit service, sanctioning a "separate but unequal" system of public transportation where wheelchair users do not use the fixed route bus system and are segregated to paratransit, a clearly inferior transportation service. The district court erred by failing to recognize that, under Title II of the ADA, Part B, discrimination includes failure to provide program access and failure to make alterations so the altered facilities are readily accessible to and usable by individuals with disabilities.

14

*Second*, the district court erred in holding that Centro could rely upon its paratransit system in lieu of making its fixed route bus system accessible. Under the regulations and guidance materials, the Federal Transit Authority has explained that paratransit service is not intended to be a substitute for accessible fixed route bus service.[5] Paratransit is a distinct service intended for the infirm or those with severe disabilities. The ADA requires public entities make their fixed route bus system accessible. The district court's holding that Mr. Woods was entitled to no more than paratransit would render the many statutes and regulations pertaining the accessibility of buses and transportation facilities superfluous and is contrary to Congressional intent. Paratransit cannot serve as a reasonable accommodation in lieu of an accessible, fixed route bus system.

*Third and finally*, the district court erred in holding that Centro's use of commercial driveways and curb cuts as "alternative" drop off locations provided Mr. Woods with "meaningful access". Mr. Woods presented evidence and argument that Centro's proposed "alternative" was dangerous, unreasonable, and ineffective because (1) it puts individuals with disabilities at risk of getting hit by vehicular

---

[5] "In crafting the ADA, Congress recognized that even when a fixed route transit system is fully accessible, there will be some individuals whose disabilities prevent them from using the system. Congress therefore created a "safety net" to ensure that these individuals have transportation available to them on the same basis as individuals using fixed route systems." *See* ADA: Guidance, 2015 WL 6037995, at *149.

traffic; and (2) commercial driveways and curb cuts contain unknown slopes and potentially hazardous conditions. The district court erred by wholly disregarding Mr. Woods' summary judgment evidence and argument that Centro's policy of dropping off wheelchair users on commercial intersections and curb cuts was dangerous, unsafe, unreasonable, and ineffective.

## ARGUMENT

### A. STANDARD OF REVIEW.

This Court's standard of review for motions for summary judgment is *de novo*. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003) (citing *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 763 (2d Cir.2002)). On a motion for summary judgment, all factual inferences must be drawn in favor of the non-moving party. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 343 (2d Cir.1999). Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id*.

### B. MR. WOODS HAS ARTICLE III STANDING.

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceably to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Liu v. U.S. Congress*, 834 F. App'x 600, 602 (2d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Where a plaintiff seeks injunctive relief, they must "also prove that the

16

identified injury in fact presents a 'real and immediate threat' of repeated injury.'" *Kreisler v. Second Ave. Diner Corp*., 731 F.3d 184, 187 (2d Cir. 2013) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). What constitutes an injury in fact under the ADA is that the plaintiff has "personally encounter[ed] the barrier to access complained of, or [ ] has actual knowledge of the barrier complained of and has been deterred from visiting the public accommodation because of that barrier." *Panzica v. Mas – Maz, Inc.*, 2007 WL 1732123, at *3 (E.D.N.Y. June 11, 2007); *see also Disabled in Action of Metro. N.Y. v. Trump Int'L Hotel & Tower*, 2003 WL 1751785, (S.D.N.Y. Apr. 1, 2003) ("Courts considering ADA claims have found that disabled plaintiffs who had encountered barriers at restaurants, stores, hotels, or stadiums prior to filing their complaints have standing to bring claims for injunctive relief if they show a plausible intention or desire to return to the place but for the barriers").

With respect to injury, an individual with a disability is not required to "engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1). The Second Circuit has not clearly defined "actual notice," but the majority of cases suggest that "actual knowledge" under the futile gesture analysis comes from the plaintiff personally witnessing the alleged accessibility issue. *See Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133 (9th Cir. 2002); *Perdum v. Forest City Ratner Cos.*, 174 F.Supp.3d 706, 715 (E.D.N.Y.

17

2016); *Shariff v. Radamar Meat Corp.*, 2014 WL 1311563, at *2 (E.D.N.Y. Feb. 14, 2014); *Small v. Gen. Nutrition Cos*, 388 F.Supp.2d 83, 88 – 89 (E.D.N.Y. 2005). Finally, a plaintiff "need not attempt to overcome an obvious barrier" to establish a "concrete and particularized injury." *Kreisler,* 731 F.3d at 188.

Mr. Woods was born in Utica and has lived there his whole life. R.A.50. On one occasion, Mr. Woods was a passenger on a Centro bus to go to McDonald's. R.A.50. He was dropped off on the driveway of the McDonalds instead of at the bus stop. R.A.50. Because of the steep slope of the driveway, he was not able to get out of the driveway without the help of his friend. R.A.50. Mr. Woods also tried to access a Utica public bus at the stop located in the 900 block of Mathews Avenue, but was unable to use that bus stop because it did not have a landing pad. R.A.50. Once he determined that he could not access the bus at that location, he did not make further attempts because he determined that it would be dangerous. R.A.50. He was unable to even get to the bus stop because it was located on a grassy surface. R.A.50. Mr. Woods also attempted to use the bus stop at 1 Herkimer Road, but was unable to access the stop because there was a hole blocking his path. R.A.50. Mr. Woods has encountered several additional bus stops in Utica that lacked landing pads that would be dangerous for him to access. R.A.50.

Mr. Woods is deterred from using the Utica fixed route bus system because he is put in danger by being dropped off in active commercial driveways or is

physically unable to access the bus stops. Mr. Woods has actual notice that most of the bus stops in Utica are not accessible based on his prior attempts to access bus stops that lack an accessible landing pad. Mr. Woods is not required to engage in the futile gesture of attempting to board a Utica public bus at stops that lacks an accessible landing pad because he knows from his experience that it would be unsafe. A wheelchair user who encounters a retail store that has only steps leading to its entrance need not physically bump his wheels against those steps to gain legal standing. Mr. Woods' experiences with Defendants' bus stops is no different. Mr. Woods would use the Utica public bus if the stops were made accessible. R.A.145, 57:9-58:6. Mr. Woods has standing to obtain injunctive relief.

Likewise, the district court found that Mr. Woods has standing to pursue injunctive relief. R.A.23. This Court should affirm that Mr. Woods has standing to pursue his case.

## C. THE DISTRICT COURT ERRED BY FAILING TO RECOGNIZE THAT DISCRIMINATION UNDER TITLE II OF THE ADA, PART B, INCLUDES BOTH ALTERATION STANDARD VIOLATIONS AND PROGRAM ACCESS VIOLATIONS.

The ADA is divided into four subchapters. Subchapter II pertains to public services and Subchapter III pertains to public accommodations and services operated by private entities.

19

Subchapter II is then divided into two parts: Part A, which is a general non-discrimination chapter, and Part B, which provides specific laws related to public transportation. Within Part B, there are various sections. Section 12141 provides for definitions. Section 12143 relates to paratransit. Section 12147 is entitled "Alterations of existing facilities." Section 12148 pertains to public transportation programs and activities in existing facilities.

Section 12147 of Part B of the ADA (pertaining to alterations) states:

> "With respect to alterations of an existing facility or part thereof used in the provision of designated public transportation services that affect or could affect the usability of the facility or part thereof, it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of title 29, for a public entity to fail to make such alterations (or to ensure that the alterations are made) in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations."

The statute makes clear that one type of "discrimination" under the ADA is the failure of a transportation provider to make an altered facility accessible. In *Hamer v. City of Trinidad*, the Tenth Circuit explained that each time an individual with a disability encounters a non-compliant condition, they encounter a new injury under the ADA. 924 F.3d 1093, 1107 (10th Cir. 2019) ("each time a qualified individual with a disability encounters or 'actually become[s] aware of' a non-compliant

20

service, program, or activity 'and is thereby deterred' from utilizing that service, program, or activity, he or she suffers discrimination and a cognizable injury.").

The text of the statute likewise confirms that even a singular instance of exclusion constitutes discrimination. Section 12148 (pertaining to existing facilities) states "it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of title 29, for a public entity to fail to operate a designated public transportation program or activity conducted in such facilities so that, when viewed in the entirety, the program or activity is readily accessible to and usable by individuals with disabilities." *See* 42 U.S.C. § 12148 (a)(1). Notably, the statute uses the phrase "a designated public transportation program or activity," which clearly reveals that discrimination as to *any* program or activity is prohibited.[6] That reading is consistent with the text of the RA, which prohibits discrimination as to "any" program or activity. *See* 29 U.S.C. § 794(a) ("[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity.").

---

[6] Use of the word "a" here is synonymous with the words "any" or "all." By way of example, if the Second Circuit had a policy stating, "use of a cell phone in a courtroom is prohibited," that policy would be plainly read to prohibit use of a cell phone in any of the courtrooms. It could not be fairly or reasonably read to prohibit use of cell phones in Courtroom A and permit use of cell phones in Courtroom B.

When Congress passed the ADA it proscribed specific conduct as discrimination. "The ADA describes discrimination in both general and specific terms." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008). In *Roberts*, brought under Subchapter III, the Second Circuit recognized that a violation of the alteration standard constitutes discrimination. 542 F.3d at 368-69. Other circuits have also recognized that exclusion due to new construction or alteration violations constitute discrimination. See, e.g., *Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011) (discrimination to build new sidewalks that are inaccessible); *Cohen v. City of Culver City*, 754 F.3d 690, 696 (9th Cir. 2014) (quoting new construction regulation and stating that the regulation "effectuate[s] the ADA's mandate that public entities make reasonable modifications to their programs and services to accommodate disabled persons."). In a similar ADA case, the district court found that a plaintiff could bring a claim for inaccessible bus stops under the separate theories of (a) failure to ensure that the altered facilities were readily accessible to and usable by individuals with disabilities, (b) failure to provide "program access," and (c) failure to provide a reasonable accommodation. *Wright v. Bd. of Commissioners of Cap. Area Transit Sys.*, No. CV 20-644-SDD-RLB, 2022 WL 17574078, at *9-12 (M.D. La. Dec. 9, 2022). Likewise, in *Falls v. Bd. of Commissioners of New Orleans Reg'l Transit Auth.*, the district court for the Eastern District of Louisiana considered a case wherein the plaintiffs alleged that nearly

22

94.3% of all bus stops were non-compliant with ADA requirements; the *Falls* court found that the defendants had discriminated against those plaintiffs as to the existing bus stops. No. CV 16-2499, 2017 WL 2730781, at *4 (E.D. La. June 26, 2017).

Mr. Woods directed the district court to the alteration requirement (49 C.F.R. § 37.43(a)(1)), case law pertaining to the alteration requirement of the ADA, and facts related to his alteration claim. Specifically, Mr. Woods put forth evidence that Centro failed to comply with the alteration requirement of the ADA because, in 2015, Centro installed signs bearing the words "ACCESSIBLE STOP" along with the international symbol of accessibility on the physical bus stops in Utica. R.A.76. Similarly, Centro's bus maps/schedules were modified in 2019 to include the international symbol of accessibility on nearly every bus stop. R.A.76. By adding signage that clearly indicates the bus stops are "ACCESSIBLE," Centro triggered the "alteration" standard of the ADA and is thus obligated to ensure that the bus stops designated as "accessible" strictly comply with the ADA Accessibility Guidelines. Having fundamentally altered the nature of the bus stops, Centro was obligated to ensure that the modified stops are accessible.

As to his program access claim, Mr. Woods directed the district court to cases related to program access, including two district court cases which utilized the program access standard in relation to fixed route bus systems. R.A.62. Mr. Woods also provided voluminous evidence that Centro's fixed route bus system, when

viewed in its entity, was pervasively non-compliant. R.A.62. Mr. Woods' provided his personal account of the inaccessible bus stops and buttressed his experiences with expert evidence. Specifically, Mr. Nicholas Heybeck, P.E. measured the bus stops in Utica and conclusively established that **ninety-one (91%) percent** of the bus stops surveyed were non-compliant. R.A.85-86. Of the 115 bus stops surveyed, 60 either have no boarding area whatsoever, have boarding areas that cannot be physically reached by the bus ramps, or boarding areas that were not the required minimum 60" by 96" dimensions. R.A.102, fn32. When the bus stops had landing pads that were the proper distance from the curb and met the required size, 39 of those landing pads either contained a slope that exceeded the maximum required 2.1% in all directions or contained changes in level that exceeded the maximum ¾" (or generally contained cracked and poor concrete). R.A.76. In response, Centro offered no evidence that their bus stops were ADA accessible.

In his summary judgment briefing, Mr. Woods acknowledged that under a program access claim a public entity can point to "nonstructural alternatives" that it is pursuing to alleviate the impact of the barriers while still providing access to the service at issue. However, Centro did not present evidence of any meaningful "non-structural alternatives" that it was pursuing to alleviate the impact of the inaccessible bus stops. The only "non-structural alternative" Centro could only point to was the *wholly unreasonable* suggestion that bus drivers drop Mr. Woods off in active

24

commercial driveways and on curb cuts where he would be at risk of getting hit by a car or disembarking on a dangerously steep curb cut.[7] In any event, however, the district court failed to address Mr. Woods' program access claim.

Finally, as to his reasonable modification claim, Mr. Woods directed the court to legal authorities, including cases and the on-point ADA regulation, 49 C.F.R. § 37.5(i)(3), which obligates transportation providers to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability or to provide program accessibility…" R.A.60. Mr. Woods directed the district court to evidence that Centro's services were inaccessible, that Mr. Woods made a written request for a modification, and that Centro failed to provide any modification in response to Mr. Woods' written request. Ultimately, the district court did perform a cursory "meaningful access" inquiry which can be construed as an evaluation of Mr. Woods' reasonable accommodation claim.

The district court failed to address two of Mr. Woods' three theories of discrimination. The district court failed to analyze whether Centro committed discrimination by violating the alteration requirement and by failing to provide

---

[7] A curb cut is a sloped ramp that connects the street to the sidewalk. By definition, a curb cut is not flat. Landing pads must be flat so that wheelchair users do not roll around or fall over when boarding and alighting busses. It is per se unreasonable to drop off a wheelchair user on a curb cut because curb cuts are not flat.

program access. These claims were simply ignored. When a district court fails to explain its reasoning with clarity, the Court of Appeals should reverse with instructions for findings and an explanation. See, e.g., *Dotson v. City of Syracuse*, 688 F. App'x 69, 72 (2d Cir. 2017) (vacating an award of summary judgment where the district court did not reference or analyze evidence that the plaintiff argued was sufficient evidence of pretext); *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir.2015) (per curiam) (vacating district court's grant of summary judgment dismissing plaintiff's NYCHRL claims for failing to explain "with sufficient clarity" its reasons for dismissing the NYCHRL claims); *Beckford v. Portuondo*, 234 F.3d 128, 130 (2d Cir.2000) (quoting *Orchano v. Advanced Recovery, Inc.*, 107 F.3d 94, 99 (2d Cir.1997)) (" 'If the court fails to make findings and to give an explanation, and the reason for the court's ruling is not clear to us, we will remand for findings and an explanation.' ").

In the alternative, should this Court read the district court's ruling as a rejection of the ability of a plaintiff to bring a claim under the alteration standard or the program access standard, that is clear error and must be reversed. The district court appears to have concluded that, under the ADA, the court need only perform a generalized "meaningful access" assessment. But, as is set forth above, Section 12147 and Section 12148 each describe the prohibited conduct as "discrimination."

26

To be sure, in prior holdings this Court has used the shorthand phrase "meaningful access." But this Court has also held that "[t]he ADA describes discrimination in both general and specific terms." *Roberts*, 542 F.3d at 368. Given that the ADA contains its own definitions of discrimination, this Court must "examine the ADA itself and its own definitions of discrimination." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). A court need only perform a generalized "meaningful access" assessment where no specific statutory or regulatory requirement is at issue. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, ⸺ U.S. ⸺, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) ( "It is a commonplace of statutory construction that the specific governs the general." (alteration and quotation marks omitted)).

Here, the ADA includes specific provisions for each of the alteration requirement (42 U.S.C. § 12147), the program access requirement (42 U.S.C. § 12148), and the reasonable modification requirement (28 C.F.R. § 37.5(i)). The district court's assessment of Mr. Woods' claims should have been performed within the structure of these legal requirements. Instead, the district court performed a generalized "meaningful access" assessment that was unmoored from the language of the specific claims at issue. The judgment in favor of Centro as to Mr. Woods' "alteration standard" and "program access" claims should be reversed. See *Velazco*, 778 F.3d at 411.

27

**D.**   **THE DISTRICT COURT ERRED BY CREATING A NEW RULE THAT TRANSPORTATION PROVIDERS NEED NOT MAKE THEIR FIXED ROUTE BUS SYSTEM ACCESSIBLE IF THEY PROVIDE PARATRANSIT.**

The district court established a rule that creates a "separate but unequal" system of public transportation in which wheelchair users are relegated to paratransit, a clearly inferior transportation service. The district court's new rule is legally erroneous and must be reversed.

1) *Paratransit is Intended to Serve as a Complement to an Accessible Fixed Route Bus System, Not as a Substitute for Accessible Fixed Route Service.*

Paratransit is a complement to, not a substitute for, an accessible fixed route bus system. Paratransit service is a means for individuals with severe disabilities to be accommodated when they are incapable of using an otherwise accessible fixed route bus system. That paratransit service is not a "substitute" for an accessible fixed route system is evident from the differences in the services and the attendant the regulatory framework.

Paratransit service is vastly different from the fixed route bus system. These differences are memorialized in the factual record in this case. According to Joshua Gardner, Centro's manager of the paratransit department, a paratransit ride can only be made in advance. R.A.90. Riders must make their appointment to be picked up and dropped off by 5:00 the day before. R.A.90. Because of this rule, most citizens of Utica can catch the bus at a moment's notice while disabled paratransit riders cannot do the same. In their brief, Centro claimed that it "also allows for 'same day'

28

trips in some circumstances, depending on vehicle availability and the nature of the trip request." R.A.158. But this defense tacitly admits that this "same day" availability is intermittent and cannot be relied upon for spur of the moment travel.

The differences between paratransit and the fixed route bus system extend beyond the same-day travel issue and reach the fundamental integration mandate of the ADA. Far from operating as an integrated service, all riders on paratransit are either severely disabled or are a companion or assistant of a disabled person. (*See Infra*, discussing paratransit eligibility). A paratransit rider is only entitled to travel with one companion. *See* 28 C.F.R. § 37.123(f)(1). Riders on a fixed route bus system can be accompanied by as many companions as they like. This is segregation.

In passing the ADA, Congress found that "society has tended to isolate and segregate individuals with disabilities" and that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2). Forcing independent wheelchair users who are physically able to roll onto a bus—such as Mr. Woods—to use a segregated paratransit service is antithetical to the purpose and intent of the ADA. Additionally, the Second Circuit has held that prison accommodations to a mobility-impaired inmate were not "plainly reasonable" where they had to be requested "in advance" and were inadequate to meet the plaintiff's "spontaneous needs." See *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 74 (2d Cir. 2016) ( "A mobility-impaired

inmate that must book a mobility aide 'well in advance' will be unlikely, for example, to obtain assistance when a sudden need to use the restroom arises and will probably avoid the prison yard, lest he or she be unable to escape a prison fight quickly.").

The FTA has confirmed that paratransit "is not intended to be a comprehensive system of transportation" and, instead, was intended to be a "safety net." The FTA states in the preamble to the final ADA regulations: "complementary paratransit is not intended to be a comprehensive system of transportation for individuals with disabilities." *See* Transportation for People With Disabilities, 56 Fed.Reg. at 45,601 (Sep. 6, 1991) (codified at Title 49 Part 37). The FTA further explained in its Circular on the ADA, Chapter 8, Complementary Paratransit Service,

> "In crafting the Americans with Disabilities Act (ADA), Congress recognized that even when a fixed route transit system is fully accessible, there will be some individuals whose disabilities prevent them from using the system. Congress therefore created a "safety net" to ensure that these individuals have transportation available to them on the same basis as individuals using fixed route systems."

*See* ADA: Guidance, 2015 WL 6037995, at *149.

Paratransit is a way for transportation providers to accommodate individuals with disabilities that are so severe that they cannot use accessible fixed route bus system. Congress also required that new buses or vehicles purchased by public entities for use on their fixed route bus system be accessible (28 C.F.R. § 37.7), that alterations

30

be performed in a manner that makes the altered facilities accessible (28 C.F.R. § 37.43), and that program access be provided (28 C.F.R. § 37.61). If Congress had intended all disabled individuals be relegated to paratransit service, it would not have included those requirements in the statutory scheme.

The district court did not engage with the FTA's explanation of the limited role of paratransit and, instead, primarily relied upon the antiquated Fifth Circuit case *Melton*. As is discussed in detail below, *Infra* 39-41, the *Melton* decision has been overruled by subsequent regulatory action. To be clear: the district court relied upon case law that was overruled by regulatory action.

The district court cited the case of *Brooklyn Ctr. for Independence of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55 (2d Cir. 2021) for the notion that a transportation provider can provide "meaningful access" through use of paratransit.[8] But *Brooklyn Ctr. For Independence of the Disabled* is not dispositive of Mr. Woods' argument that paratransit cannot serve as a substitute for accessible fixed route bus system. Mr. Woods raises two arguments that were not before this Court in *Brooklyn Ctr. For Independence of the Disabled*: (1) Section 12147 and Section 12148 each define specific conduct as "discrimination" and an entity's provision of

---

[8] *See* R.A.29. ("As the Second Circuit recently noted, 'meaningful' access is not 'total' access, *see Brooklyn Ctr. for Independence*, 11 F.4th at 63, and the FTA has clearly provided in its regulations that prior-day reservations do not preclude such 'meaningful access.' ").

paratransit cannot obviate a violation of either statutory requirement; and (2) paratransit is not intended (or permitted) for use by individuals who can use a fixed route bus system and, instead, is only intended for use by individuals with severe disabilities.

First, *Brooklyn Ctr. For Independence of the Disabled* does not stand for the proposition that a court can disregard the specific, statutory definitions of discrimination provided by Congress and the FTA. In *Brooklyn Ctr. For Independence of the Disabled*, the plaintiffs sued because some subway elevators in New York City would continually fall into disrepair, blocking access. *Id*. at 59-60. The plaintiffs never argued that the defendants' conduct violated Section 12147 or Section 12148. Nowhere in *Brooklyn Ctr. For Independence of the Disabled* does the court state that a plaintiff cannot sue a transportation provider for specified discrimination, such as an "alteration standard" violation or a "program access" violation. Instead, the Court's primary focus was on the one claim brought by the plaintiffs: failure to provide a reasonable accommodation.

Second, in *Brooklyn Ctr. For Independence of the Disabled* the court did not evaluate whether—under the statutory and regulatory scheme—a transportation provider is obviated from making its fixed route bus system accessible if it also provides paratransit. In *Brooklyn Ctr. For Independence of the Disabled v. Metro. Transp. Auth.*, the MTA argued that the court should assess its overall system,

including its provision of paratransit, to determine whether meaningful access was provided. 11 F.4th at 60, 63. **The plaintiffs did not argue that paratransit service is not intended (or permitted) for use as a substitute for an accessible fixed route bus system.** As such, in that case, the court was working based on a *presumption* that paratransit service can sometimes serve as a substitute when another service is temporarily inoperable. Quite simply, the legal arguments raised by Mr. Woods in this case were not before the court in *Brooklyn Ctr. For Independence of the Disabled v. Metro. Transp. Auth.*

Based on the statutory and regulatory scheme and guidance materials, this Court should conclude that <u>both</u> paratransit service and fixed route bus service must be accessible. This interpretation tracks the Supreme Court's explanation of the ADA as covering each service of an entity, as discussed *Infra* at 34-39.

Finally, paratransit cannot serve as a substitute to fixed route bus service because individuals who retain the ability travel independently on an otherwise accessible vehicle are not eligible to use paratransit service. The paratransit regulations provide clear eligibility requirements. The regulations do not state that an individual becomes eligible to use paratransit if the bus stops on the fixed route bus system are inaccessible. *See* 28 C.F.R. § 37.123(e)(1) (individuals are eligible for paratransit when "as the result of a physical or mental impairment" they are unable to independently board, ride, or disembark an otherwise accessible vehicle

on the system); § 37.123(e)(2) (individuals are eligible for paratransit when an accessible vehicle is not provided on the desired route); and § 37.123(e)(3) (individual has a specific impairment-related condition that renders it difficult to reach the pick up or drop off location, such as chronic fatigue, blindness, a lack of cognitive ability to remember and follow directions, or a special sensitivity to temperature).[9] Absent from this paratransit-eligibility list is the transportation provider's own failure to make its bus stops accessible. Said differently, according to the paratransit regulations, individuals who can use a lift on an accessible bus are not even eligible to use paratransit service. This evidences that paratransit service is not intended (or permitted) to serve as a substitute for accessible fixed route bus service.

---

[9] The regulation also contains several further subparts, including one that provides that paratransit can be used by individuals with disabilities when usage of a particular location is precluded on an "otherwise accessible route." § 37.123(e)(2)(i). Specifically, the regulation states that an individual can use paratransit if the stop the individual would use is precluded because of § 37.167(g). *Id.* The regulation at § 37.167(g) states that an entity can prohibit boarding or disembarking at a stop when "the lift cannot be deployed, the lift will be damaged if it is deployed, or temporary conditions at the stop, not under the control of the entity, preclude the safe use of the stop by all passengers." *See* § 37.167(g).

Quite simply, § 37.123(e)(2)(i) is a means for transportation providers to make their paratransit service temporarily available when a particular stop is unavailable on an "otherwise accessible route." It is not a broad exception that permits use of paratransit in lieu of making a fixed route bus system accessible.

2) *A Transportation Provider's Programs and Services Must be Evaluated Separately.*

In reaching its erroneous conclusion concerning Centro's obligations under the ADA, the district court rejected Mr. Woods' reliance on a seminal Supreme Court case concerning the proper application of the ADA to activities, services, and programs of covered entities.

In *Pennsylvania Dep't of Corr. v. Yeskey*, the Supreme Court evaluated the ADA and held that an entity's activities, services, and programs must be evaluated individually, explaining that one prison could contain "many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." 524 U.S. 206 (1998). Relying on *Yeskey*, Mr. Woods argued that each of Centro's transportation services (the fixed route bus system and the paratransit service) must be accessible to individuals with disabilities. *See* R.A.122-123. (providing discussion of *Yeskey* and concluding "Thus, paratransit service and fixed route service are two separate and distinct services."). The district court rejected Mr. Woods' reliance upon *Yeskey* because it was a "decision regarding accessibility to medical services and other prison programs…" R.A.27, fn4.

Nothing in *Yeskey* suggests its holding should be narrowly read to only apply to prison cases. In *Frame v. City of Arlington*, the Fifth Circuit used *Yeskey* to

evaluate and hold that sidewalks and curb cuts are a service, program, or activity of a public entity. 657 F.3d 215, 225 (5th Cir. 2011) And the notion that the ADA is an expansive statute is a well-established principal. *Johnson v. City of Saline*, 151 F.3d 564, 569-71 (6th Cir.1998) (finding that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does" and stating that "Title II is broadly applicable to all of the activities of a public entity."); *Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1165 N. 5 (D. Colo. 2020) (collecting cases as to the broad application of the ADA, including to prisons, zoning decisions, foster care, open burn regulations, quarantine measures, public contracting, streets, roads, and highways, and installation and maintenance of crossing signals at crosswalks).

The Supreme Court's holding *PGA Tour, Inc. v. Martin*, further elucidates that every service provided by an entity must be ADA compliant and evaluated individually. 532 U.S. 661 (2001). In that case, the plaintiff sued "a lessor and operator of golf courses" because he needed a reasonable accommodation of using a golf cart during a tournament. In explaining that the ADA covered the service at issue, the Supreme Court stated:

> "Certainly, among the 'privileges' offered by petitioner on the courses are those of competing in the Q–School and playing in the tours; indeed, the former is a privilege for which thousands of individuals from the general public pay, and the latter is one for which they vie. Martin, of course, is one of those individuals. It would therefore appear that Title III of the ADA, by its plain

36

terms, prohibits petitioner from denying Martin equal access to its tours on the basis of his disability."

*Id*. at 677.

The above quotation shows that exclusion of an individual with a disability from any one of the many services or privileges offered by an entity can constitute "discrimination." In *Martin* the plaintiff's sought to compete in a tour using a golf cart and the Court proceeded to evaluate whether a reasonable accommodation could be provided as to *that specific service*. This interpretation also tracks the Department of Justice's explanation of its regulations for the ADA, under which ***all*** the services, programs, and activities of a public entity must comply with the ADA:

> "Some commenters asked for clarification about the responsibilities of public school systems under section 504 and the ADA with respect to programs, services, and activities that are not covered by the Individuals with Disabilities Education Act (IDEA), including, for example, programs open to parents or to the public, graduation ceremonies, parent-teacher organization meetings, plays and other events open to the public, and adult education classes. Public school systems must comply with the ADA in all of their services, programs, or activities, including those that are open to parents or to the public. For instance, public school systems must provide program accessibility to parents and guardians with disabilities to these programs, activities, or services, and appropriate auxiliary aids and services whenever necessary to ensure effective communication, as long as the provision of the auxiliary aids results neither in an undue burden or in a fundamental alteration of the program."
>
> 28 C.F.R. Pt. 35, App. B, *Appendix B To Part 35—Guidance On ADA Regulation On Nondiscrimination On The Basis Of*

*Disability In State And Local Government Services Originally Published July 26, 1991* (effective March 15, 2011). [10]

A public entity is not permitted to "choose its own adventure" and make some services accessible and leave others inaccessible. A patchwork of (in)accessible services not only runs counter to the Supreme Court's holdings, but it also contravenes the intent and purpose of the ADA, which was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1).

Undersigned has located no cases, Congressional history, or regulatory text to suggest that the broad coverage of the ADA, as explained in *Yeskey*, is inapplicable to transportation providers. Congress expressly stated it intended the ADA to be "comprehensive" in its coverage and described Title II as "a general prohibition against discrimination" that "extends the anti-discrimination prohibition embodied in [§] 504 [of the RA] to <u>all actions</u> of state and local governments." *See* H.R. REP. 101-485, 23, 84, as reprinted in 1990 U.S.C.C.A.N. 303, 304, 367 (emphasis added). The Congressional record also included evidence of the unsuitability of paratransit as a substitute for an accessible fixed route bus system. *Americans with Disabilities*

---

[10] An agency's interpretation of a statute "is entitled to great deference, particularly when that interpretation has been followed consistently over a long period of time." *United States v. Clark*, 454 U.S. 555 (1982). A review of the Department of Justice's website for the ADA, ADA.gov, reveals a wealth of settlement agreements and consent decrees against public entities where the United States has forced said entities to make their services ADA compliant.

*Act of 1988: Oversight Hearing on H.R. 4498 Before the Subcommittee on Select Education of the House Committee on Education and Labor*, 100th Cong. 100–09 (1988) (Statement of David Scott, Indianapolis Resource Center for Independent Living) (explaining the inadequacies of paratransit and concluding that "To provide adequate services, there is going to be a need for complete accessibility of public transportation. In the most objectionable words, to have a system that operate under the premise of separate but equal … is discrimination."). The district court erred in holding that Centro was not obligated to make its fixed route bus system accessible.

3) *The Department of Transportation's Regulations Firmly Establish that Individuals with Disabilities Are Entitled to Request Reasonable Accommodations as to a Fixed Route Bus System.*

In holding that Mr. Woods was entitled to nothing more than paratransit, the district court sanctioned a "separate but unequal" system of public transportation in which wheelchair users are segregated to paratransit, a clearly inferior transportation service. In reaching this result, the district court relied upon on the case of *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669 (5th Cir. 2004). In *Melton*, a disabled paratransit user requested an accommodation with the paratransit system, which was not provided, and sued to obtain the accommodation (he wanted to be picked up by paratransit behind his house instead of in front). *Id*. at 670. The Fifth Circuit held that the plaintiff was not entitled to any accommodations beyond the provision of paratransit itself, reasoning that the DOT's "comprehensive regulatory scheme

signals that no interim extra-plan modification is statutorily or otherwise required by a public entity when the public entity is properly operating under a[n] FTA-approved plan." *Id.* at 675.

In ruling on Centro's motion for summary judgment, the district court quoted and relied upon that exact language from *Melton*. R.A.27-28. The district court went on to erroneously cite *Melton* for the notion that "paratransit service operating under the FTA-approved plan 'is itself the accommodation' to an inaccessible fixed route bus system under the ADA. R.A.28.

The *Melton* court's ruling was based on a strained reading of the transportation regulations for the ADA. <u>In fact, the *Melton* decision was so erroneous that it spurred the Department of Transportation ("DOT") to amend its regulations and issue regulatory commentary explaining that reasonable accommodations are required as to **both** paratransit and a fixed route bus system.</u> R.A.28. The DOT explained:

> "However, more recent cases that addressed the issue directly held that, in the absence of a DOT regulation explicitly requiring transportation entities to make reasonable modifications, transportation entities were not obligated to make such modifications under the ADA. The leading case on this issue was *Melton* v. *Dallas Area Rapid Transit (DART),* 391 F.3d 669 (5th Cir. 2004); *cert. denied* 125 S. Ct. 2273 (2005). In this case, the court upheld DART's refusal to pick up a paratransit passenger with a disability in a public alley behind his house, rather than in front of his house (where a steep slope allegedly precluded access by the passenger to DART vehicles). The DART argued that paratransit operations are not covered by DOJ regulations. …
>
> …

40

Because the Department believed that, as in all other areas of disability nondiscrimination law, making reasonable modifications to policies and practices is a crucial element of nondiscriminatory and accessible service to people with disabilities, we proposed to fill the gap the courts had identified in our regulations. Consequently, the 2006 NPRM proposed amending the DOT rules to require that transportation entities, both fixed route and paratransit, make reasonable modifications in the provisions of their services when doing so is necessary to avoid discrimination or to provide program accessibility to services.

In § 37.5, the general nondiscrimination section of the ADA rule, the Department proposed to add a paragraph requiring all public entities providing designated public transportation to make reasonable modifications to policies and practices where needed to avoid discrimination on the basis of disability or to provide program accessibility to services. The language was based on DOJ's requirements and, like the DOJ regulation, would not require a modification if doing so would fundamentally alter the nature of the entity's service."

*Transportation for Individuals With Disabilities; Reasonable Modification of Policies and Practices*, Department of Transportation, 80 FR 13253-01, 2015 WL 1066826(F.R.), at * 13255.

The current DOT regulations are clear: transportation providers are obligated to provide reasonable accommodations as to their fixed route bus systems. *See* 28 C.F.R. § 37.5(i). Thus, without question, transportation providers are obligated to provide reasonable accommodations and program access as to their fixed route bus systems. Mr. Woods argued to the district court that *Melton* was no longer good law. R.A.37-38. The district court overlooked this argument and proceeded to base its decision on *Melton*—a case that had been overturned via regulatory action.

41

4) *Whether Centro Had an "FTA-Approved" Paratransit Plan Was Legally Immaterial.*

The district court held that Mr. Woods was afforded a "plainly reasonable accommodation" was buttressed by Centro operation in accordance with "an FTA-approved [paratransit] plan." R.A.29-30. But the FTA's approval of a "paratransit plan" has no bearing on whether a fixed route bus system is accessible. The FTA's approval of a paratransit plan analyzes factors such as "estimated demand" for the paratransit service, budget for the plan, and description of "the public participation process[.]" *See* 28 C.F.R. § 37.139. Given that paratransit service is intended for the most severely disabled individuals—those incapable of using the fixed route bus system—it is understandable that Congress wanted transit entities to have their paratransit plan reviewed by the FTA. But the regulation does not require transit entities to report the number of bus stops that are accessible, see 28 C.F.R. § 37.139 *In Globo*, and the FTA is not obligated to evaluate the accessibility of an entity's bus stops in performing its paratransit plan review. *See* 28 C.F.R. § 37.147 (elements of FTA plan review—none of which require assessment of bus stop accessibility on the fixed route bus system). That Centro had an "FTA-approved plan" does not speak to any issue in dispute. Additionally, even where an agency is tasked with initial assessment of legal compliance, it is still the court's job to decide whether the law has been violated. See generally, *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 312, 133 S. Ct. 1863, 1877, 185 L. Ed. 2d 941 (2013) (Roberts dissent) ("A court

should not defer to an agency until the court decides, on its own, that the agency is entitled to deference."). There is no indication that the FTA intended its "approval" of Centro's paratransit plan to be interpreted as approval of the condition of Centro's bus stops. In fact, there is no evidence that the FTA has ever evaluated Centro's bus stops. The district court's reliance on this "evidence" was erroneous.

Under the district court's holding, transportation providers are obviated from making their fixed route bus system accessible if they provide inferior, segregated paratransit service. This would render the ADA statutes, regulations, and guidance concerning the alteration standard, program access, and reasonable accommodation a dead letter and would relegate individuals with disabilities to paratransit service.

The canon against superfluous weighs firmly against a holding that eviscerates much of the statutory and regulatory protections for individuals with disabilities as to fixed route bus system. *United States v. Jicarilla Apache Nation*, 564 U.S. ——, ——, 131 S.Ct. 2313, 2330 (2011) (" 'As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law' " (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988))). "Reasonable modification is a central concept of disability nondiscrimination law, based on the principle that it is essential for entities to consider individuals with disabilities as individuals, not simply as members of a category." See *Transportation for*

*Individuals With Disabilities; Reasonable Modification of Policies and Practices*,
DOT, 80 FR 13253-01, 2015 WL 1066826(F.R.), at * 13257. As to their fixed route
bus systems, transportation providers are obligated to comply with the alteration
standard, provide program access, and provide reasonable accommodations. The
district court's opinion should be overturned.

### E. THE DISTRICT COURT ERRED IN HOLDING THAT CENTRO'S USE OF INTERSECTIONS AND COMMERCIAL DRIVEWAYS PROVIDED MR. WOODS WITH "MEANINGFUL ACCESS."

In a footnote, with no explanation, the district court held that Centro's use
commercial driveways and curb cuts as alternative pick-up and drop-off areas
provided Mr. Woods with "meaningful access." The district court provided no
explanation as to how commercial driveways and curb cuts are a safe, effective, or
reasonable location for wheelchair users to board or disembark public busses.

*First*, as a threshold matter, the district court's conclusion that Centro's use of
commercial driveways and curb cuts as alternative "pick up and drop off locations"
should be reversed for failure to explain "with sufficient clarity" its reasoning. See,
e.g., *Dotson*, 688 F. App'x at 72; *Velazco*, 778 F.3d at 411; *Beckford*, 234 F.3d at
130. The district court completely failed to acknowledge, much less grapple with,
Mr. Woods' argument and evidence that use of commercial driveways and curb cuts
as alternative "pick up and drop off locations" was unreasonable because of safety
concerns and the unknown condition of the slopes and surfaces. Mr. Woods testified

that he was dropped off on the driveway of a McDonald's instead of at the bus stop. R.A.81. Because of the steep slope of the driveway, he was not able to get out of the driveway without the help of his friend. R.A.81 Mr. Woods further supported his argument by reference to deposition transcripts, including testimony from Centro's expert. If these alternative pick up and drop off areas are unsafe, then they cannot be reasonable. Mr. Woods' evidence and arguments were ignored by the district court and replaced with mere speculation and conjecture as to what is "meaningful access."

*Second*, the district court's ruling should be reversed because the use of commercial driveways and curb cuts as alternative "pick up and drop off locations" is not a "plainly reasonable accommodation" such that the entry of summary judgment in favor of Centro was appropriate. For individuals with disabilities, "the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945-46 (9th Cir. 2011) (en banc). It is common sense that Centro's proposed "policy" of having wheelchair users board or alight in commercial driveways is dangerous and therefore unreasonable. In *Sarfaty v. City of Los Angeles*, the court held that forcing wheelchair users into the path of cyclists was discriminatory under the ADA. No. 2:17-CV-03594-SVW-KS, 2020

WL 4697906, at *6 (C.D. Cal. Aug. 12, 2020). Surely the risk of getting hit by a car is greater than the risk of getting hit by a bicycle.

What constitutes a "reasonable" accommodation is a fact intensive inquiry ill-suited for the summary judgment stage. "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002); see also, *Poway Unified Sch. Dist. v. K.C. ex rel. Cheng*, No. 10CV897-GPC DHB, 2014 WL 129086, at *7 (S.D. Cal. Jan. 14, 2014). "An accommodation is not plainly reasonable if it is so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016). Even a ten-minute delay can result in a proposed accommodation not being "plainly reasonable." See *Celeste v. E. Meadow Union Free Sch. Dist.*, 373 Fed.Appx. 85, 88 (2d Cir. 2010) (finding sufficient evidence for a jury to conclude that a mobility-impaired student was denied meaningful access because he was "forced [ ] to take a ten minute detour" in order to participate as the manager of his school's football team).

In July of 2004, the rules and regulations related to ADA accessibility guidelines were updated, and the Architectural and Transportation Barriers Compliance Board explained the purpose of its rulemaking as to the ADA Accessibility Guidelines and attendant regulations:

"To ensure that buildings and facilities are accessible to and usable by people with disabilities, the ADA establishes accessibility requirements for State and local government facilities under title II and places of public accommodation and commercial facilities under title III. The law requires that the Board issue minimum guidelines to assist the Department of Justice (DOJ) and the Department of Transportation (DOT) in establishing accessibility standards under these titles. Those standards must be consistent with the Board's guidelines."

*36 CFR Parts 1190 and 1191 Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities; Architectural Barriers Act (ABA) Accessibility Guidelines; Final Rule*, Friday, July 23, 2004, Federal Register, Vol 69, No 141, p. 44084

The purpose of the carefully crafted ADA Accessibility Guidelines is to "ensure that buildings and facilities are accessible to and usable by people with disabilities[.]" Instead of complying with federally published accessibility guidelines, Centro haphazardly uses commercial driveways where cars are whizzing by and containing unknown slopes, terrain, or conditions. With no explanation, the district court sanctioned Centro's disregard of federally adopted accessibility standards in favor of active commercial driveways.

In the limited instances where a court has held that an accommodation was "plainly reasonable," there were no safety or efficacy concerns. See *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 97 (2d Cir. 2015) ("plainly reasonable" to provide deaf individual ASL interpreters; no evidence interpreters were unqualified); *Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996) ("plainly reasonable" to provide employee ergonomic furniture and to allow her to move

47

around and stretch periodically; no safety or effectiveness concerns noted in opinion); *Cf. Wright*, 831 F.3d 74 (mobility accommodations not "plainly reasonable" where accommodations had to be requested in advance and could not satisfy the plaintiff's spontaneous needs). The hallmark of a reasonable accommodation is effectiveness. See *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) ("It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness.").

Far from providing "meaningful access," Centro's proposed use of commercial driveways and curb cuts as "alternative" pick up and drop off locations was plainly *ineffective and unreasonable*. Summary judgment should have issued in Mr. Woods' favor as it is patently unreasonable to drop off and pick up wheelchair users in commercial driveways and curb cuts. In the alternative, however, the district court should have held that there was a genuine issue of material fact as to whether Centro's proposed use of "commercial driveways" was reasonable, safe, or effective.

## CONCLUSION

Congress passed the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). The district court has effectively rolled back that mandate by establishing a rule where transportation providers can segregate individuals with disabilities to an inferior public transportation system. The purpose of paratransit

48

was always to serve as a "complement" for individuals who are infirm or whose disabilities are so severe that they cannot use an otherwise accessible fixed route bus system. Paratransit was not intended to serve as a "separate and unequal" system of transportation for all individuals with disabilities.

The district court's opinion should be reversed in its entirety. Mr. Woods further requests that this Court hold that there is a genuine issue of material fact as to Mr. Woods' reasonable accommodation claim and instruct the district court to evaluate Mr. Woods' alteration and program access claims in light of the instant opinion.

Respectfully Submitted,

By:/s/ Garret S. DeReus
**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999
F: 504-948-9996
*Counsel of Record for*
*Plaintiff/Appellant, Travis Woods*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the 10th day of February, 2023, service by Electronic Notice through the CM/EF system was made upon all counsel of record. I further certify that on this same date, a copy of this brief was served on the counsel of record for Defendants-Appellants via Electronic Mail.

By:/s/ Garret S. DeReus
**Garret S. DeReus**

## **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,639 words, as determined by the word-count function of excluding the parts of the brief exempted by Fed. App. P.32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). Because this brief has been prepared in a proportionally spaced typeface using Microsoft word in 14-point Times New Roman.

By:/s/ Garret S. DeReus
**Garret S. DeReus**

Dated: February 10, 2023

50