# NO. 22-2629

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

TRAVIS WOODS, an individual,

Plaintiff – Appellant,

v.

CENTRO OF ONEIDA, INC., CENTRAL NEW YORK
REGIONAL TRANSPORATION AUTHORITY,

Defendants – Appellees,

CITY OF UTICA,

Defendant.

On Appeal from the United States District Court, Northern District of New York,
No. 6:20-cv-00539, Honorable Frederick J. Scullin, Presiding

### REPLY BRIEF OF APPELLANT

**BIZER & DEREUS, LLC**
ANDREW D. BIZER
GARRET S. DEREUS
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999
*Attorneys for Plaintiff-Appellant Travis Woods*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………ii

TABLE OF AUTHORITIES…………………………………………………iv

I.     INTRODUCTION…………………………………………………1

II.    ALTERATIONS STANDARD…………………………………………3

   1.  Centro Did Not Dispute That the District Court Failed to Evaluate Mr. Woods' Alteration Standard Claim ................................................................. 3

   2.  Designation of Bus Stops as "Accessible" Constitutes a "Change" and Centro Offers No Rationale to Conclude Otherwise ............................................. 4

   3.  The Access Board Webpage Cited by Centro is Non-Binding and Inapplicable ................................................................................................ 8

III.   PROGRAM ACCESS - PARATRANSIT…………………………………11

   1.  Centro Fails to Address the Supreme Court Case of *Yeskey* and, Instead, Adds Language to the Text of 42 U.S.C. § 12148.................................... 12

   2.  The District Court Cases Cited by Centro Misapplied the Law ................... 13

   3.  Paratransit is Limited to Severely Disabled Persons................................... 14

IV.   PROGRAM ACCESS – PURPORTED "ALTERNATIVE" PICK UP SITES........................................................................................................16

   1.  The District Court Failed to Adequately Evaluate This Issue ..................... 16

   2.  Centro's Attempt to Re-Write the Factual Narrative is Unavailing ............ 17

   3.  The ADA Regulations Do Not "Specifically Endorse" the Use of Driveways and Curb Cuts in Lieu of Making Bus Stops Accessible .......................... 18

   4.  Mr. Woods' Experience at the McDonald's Was Not "Successful."............... 19

V.    REASONABLE ACCOMMODATION....................................................20

VI.   STANDING....................................................................................22

   1.  Mr. Woods has Suffered an Injury-in-Fact............................................... 23

   2.  Mr. Woods Intends to Use Centro's Fixed Route Bus System in the Future 25

   3.  Defendants' Attack on Mr. Woods's Litigation History is Legally Insufficient. Further, Mr. Woods' Litigation History is Consistent with the Structure of the ADA ............................................................................... 26

**VII.    CONCLUSION** ...............................................................................**28**

**CERTIFICATE OF SERVICE**……………………………………………**29**

**CERTIFICATE OF COMPLIANCE** .................................................**30**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Chapman v. Pier 1 Imps. (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) ........................................................................17

*D'Lil v. Best W. Encina Lodge & Suites*,
   538 F.3d 1031 (9th Cir. 2008) ......................................................................28

*Disabled in Action v. City of New York*,
   360 F. Supp. 3d 240 (S.D.N.Y. 2019) ..........................................................18

*Farricielli v. Holbrook*,
   215 F.3d 241 (2d Cir.2000) ............................................................................4

*Frame v. City of Arlington,*
   657 F.3d 215 (5th Cir. 2011) ..........................................................................8

*Francis v. Coughlin*,
   849 F.2d 778 (2d Cir. 1988) ...........................................................................4

*Gordon v. City of New York*,
   2005 WL 2899863 (2d Cir. Nov. 3, 2005) .....................................................4

*Kennedy v. Floridian Hotel, Inc.*,
   2018 U.S. Dist. Lexis 207984 (S.D.Fla. Dec. 7, 2018) .......................... 26, 27

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)........................................................... 9, 10, 15

*Kreisler v. Second Ave. Diner Corp.*,
   731 F.3d 184 (2d Cir. 2013) .........................................................................25

*Langer v. Kiser*,
   57 F.4th 1085 (9th Cir. 2023) ......................................................................26

*Miller v. California Speedway Corp.*,
536 F.3d 1020 (9th Cir. 2008) ....................................................9, 10

*Molski v. Evergreen Dynasty Corp.*,
500 F.3d 1047 (9th Cir. 2007) ....................................................28

*Neal v. Metro Reg'l Transit Auth.*,
2019 U.S. Dist. LEXIS 133707 (N.D. Ohio 2019) ......................................13

*Pennsylvania Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1988)............................................................ 11, 12

*Roberts v. Royal Atl. Corp.*,
542 F.3d 363 (2d Cir. 2008) ........................................................7

*Sarfaty v. City of Los Angeles*,
2020 WL 1078804 (C.D. Cal. Feb. 7, 2020) ............................................9, 10

*Tatum v. Doctor's Assocs.*,
2016 WL 852458 (E.D. La. Mar. 4, 2016) ..............................................7

*Vaughn v. Phoenix House New York Inc.*,
722 F. App'x 4 (2d Cir. 2018)......................................................4

## **Statutes**

29 U.S.C. § 792 ....................................................................9

42 U.S.C. § 12101 ..................................................................2, 3

42 U.S.C. 12148 ....................................................................12

## **Other Authorities**

*Kelly Johnson, Note, Testers Standing Up for Title III of the ADA*,
59 CASE W. RES. L.REV. 683, 710 (2009)................................................28

## <u>Regulations</u>

28 C.F.R. § 35.130 ...................................................................21

28 C.F.R. § 36.402 ...................................................................6

49 C.F.R. § 37.3 .......................................................................5

49 C.F.R. §37.43 ......................................................................8

## I.  <u>INTRODUCTION</u>

Centro opposes Travis Woods' opening brief with a combination of misstatements of law and fact. Centro mischaracterizes an article on the Access Board's website as something that has been "specifically determined" by the Access Board when it was really penned by two private individuals. Centro perverts the meaning the 42 U.S.C 12148(a)(1) by wrongfully injecting the words "public transportation system" into the statute to boost its program access argument. Centro also focuses on a nonbinding FTA "Circular" while ignoring the text of the regulation on paratransit eligibility. Centro later misrepresents that Circular to mean that it can always drop off and pick up wheelchair users in driveways and curb cuts when a simple reading of the Circular makes it clear that this exception is only applicable when "temporary conditions" exist such as sidewalk construction or snow, making conventional boarding unsafe. Centro invents new requirements for standing for an ADA plaintiff such as providing "real information" (whatever that means) and for a plaintiff to know the exact date of an injury-in-fact.

Those are just the misstatements of law. The misstatements of fact include Centro's expert claiming that he located accessible and safe locations to board and alight at certain bus stops when he never measured those locations to assess their accessibility and simply eyeballed them. Centro also misrepresents the facts pertaining to Mr. Woods' visit to McDonald's.

1

Finally, there is Centro's use of the term "unimproved bus stops." Centro defines these as "ordinary bus stops that were not specifically constructed as bus stops but rather are merely locations where a sign in the ground marks the general area in which a bus will stop." Centro provides no citation for this definition because the term "unimproved bus stop" does not appear anywhere in the ADA regulations or guidance materials. Centro is attempting to coin the term "unimproved bus stop," define that term, admit that most its bus stops are "unimproved," and then claim that there is some sort of "unimproved" exception to the ADA. Clever, but none of this has any basis in the law. The evidence in the record establishes that Centro's bus stops have been altered since 1992, and thus, are required to comply with ADA standards for alteration.

Travis Woods just wants to catch the bus like everyone else in his hometown of Utica. Congress enacted the ADA over thirty years ago to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and to assure "equality of opportunity, full participation, independent living, and economic self-sufficiency for [individuals with disabilities]." 42 U.S.C. § 12101(a) (7) and (b)(1). In passing the ADA, Congress found that "historically, society has tended to **isolate** and **segregate** individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and

pervasive social problem". 42 U.S.C. §12101(a)(2) (emphasis added). The ADA and attendant regulations were written to help folks with disabilities just like Mr. Woods. The exacting specifications for bus stop landing pads were not promulgated just to be relegated a dead letter whenever a transportation provider offers paratransit or claims its bus drivers can drop off wheelchair users in driveways or on curb cuts.

## II.   ALTERATION STANDARD

In his opening brief, Mr. Woods argued that the district court failed to address his alteration standard claim. In opposition, Centro did not address this failure of the district court. This alone warrants reversal.

Instead of addressing the district court's error, Centro responds by misstating the facts and the law associated with Mr. Woods' alteration claim. First, Centro incorrectly claims its bus stops were not altered and second, Centro misrepresents the law on the ADA by relying on a writing on the Access Board's website that states "the placement of a bus stop sign alone does not require other site improvements…"

### 1.  Centro Did Not Dispute That the District Court Failed to Evaluate Mr. Woods' Alteration Standard Claim.

Mr. Woods argued that the district court wholly failed to address his alteration standard claim. Mr. Woods argued that when a district court fails to explain its reasoning with clarity, the Court of Appeals should reverse with instructions for findings and an explanation. Appellant's Brief at 26. Centro completely fails to

address this argument. As such, Centro concedes that the district court failed to evaluate Mr. Woods' alteration standard claim.

Instead, Centro requests that this Court issue the first-ever substantive ruling on Mr. Woods' alteration standard claim. The Second Circuit has explained that it is "settled practice to allow the district court to address arguments in the first instance[.]" *Farricielli v. Holbrook*, 215 F.3d 241, 246 (2d Cir.2000). Various rulings reflect this established practice. See, e.g., *Gordon v. City of New York*, No. 05-0351-PR, 2005 WL 2899863, at *2 (2d Cir. Nov. 3, 2005);*Vaughn v. Phoenix House New York Inc.*, 722 F. App'x 4, 6 (2d Cir. 2018); *Francis v. Coughlin*, 849 F.2d 778, 780 (2d Cir. 1988).

Centro offers no rationale as to why this Court should deviate from its established practice. The Court should reverse and remand.

## 2. Designation of Bus Stops as "Accessible" Constitutes a "Change" and Centro Offers No Rationale to Conclude Otherwise.

Centro misstates Mr. Woods' claim when it asserts that "Woods Does Not Try to Argue that the Utica Bus Stops Are … Structurally Altered." Appellee's Brief at 16. Centro states "there is no evidence in the record that any of the bus stops about which Woods complaints were constructed or altered after January 26, 1992." Appellee's Brief at 16. This is simply false. Mr. Woods put forth evidence that the stops were altered in 2015 by installing new signage which included the designation "ACCESSIBLE STOP." Mr. Woods also put forth evidence that Centro's maps were

4

modified to designate the stops as accessible. As is described in Mr. Woods' opening brief and below, these alterations affected the stops' usability. While Centro may disagree as to the legal consequences that flow from these acts, it is incorrect to say that Mr. Woods put forth "no evidence" concerning alterations to the bus stops.

The modification to the designated status of the bus stops constitutes a "change" that triggered the alteration standard. Centro cites the definition of "alteration" from the DOT regulation, but this dooms their argument. An alteration is "a change to an existing facility;" and excludes "[n]ormal maintenance, reroofing, paining or wallpapering, asbestos removal, or changes to mechanical or electrical systems…" Appellee's Brief at 17-18 (citing 49 C.F.R. § 37.3).

Here, far from "normal maintenance," in 2015 Centro physically demarcated their bus stops as "accessible" through adding the words "ACCESSIBLE STOP." The designation of a feature as "accessible" is critically important as it advises members of the public that the feature can be used for their needs. By designating the bus stops as accessible, Centro affirmatively represented to the public that their stops were of specific dimensions, flat and stable, and free of obstructions.

"Normal maintenance" would include replacing the bus stop signs if had become faded by the sun or even if Centro had decided to "rebrand" the bus stop signage with a new Centro logo and color scheme. That is not what happened here. In 2015, by newly and formally designing the stops as accessible with the

international symbol of disability with the words "ACCESSIBLE STOP," Centro

changed how the stops would be identified by members of the disability community.

Centro's installation of signage that states "ACCESSIBLE STOP," along with the

same demarcation on the system maps, constitutes "a change to an existing

facility[.]" Mr. Woods argued to the district court that a change to a physical facility

constitutes an "alteration" when the act affects the <u>usability</u> of the facility—and re-

designation of a space from "non-accessible" to "accessible" constitutes an

alteration. As the court in *Tatum v. Doctor's Assocs., Inc.* explained:

> "Defendant contends that the conversion of general parking spots to accessible parking spots involved only re-painting and thus does not fall within the definition of an alteration. Rec. Doc. 55-3 at 17. However, Defendant ignores a significant portion of the applicable regulation's wording, specifically where it says painting is not an alteration *unless it affects the usability of the facility*. 28 C.F.R. § 36.402(b). Thus, the question is whether converting two parking spots to handicap-accessible spots affects usability. In light of the DOJ's interpretation that the term usability includes changes that relate to access by individuals with disabilities, this Court is convinced that the conversion qualified as an alteration. *See* 28 C.F.R. Pt. 36, App. B. The conversion of the two spots undoubtedly made the facility more accessible to individuals with disabilities by making two more spots available for parking. The Defendants' act created more parking options for individuals using wheelchairs and individuals with other disabilities who require wider parking spaces and spaces closer to the facilities. Under a broad interpretation of the term, this change affected the usability of the spaces, and the property as a whole, by increasing access. Having done so, the act qualified as an alteration, subjecting the Defendant to the "maximum extent feasible" standard. Therefore, the altered portion of the property, the parking spots, must comply fully

6

with applicable accessibility standards unless it is "virtually impossible" to do so. 28 C.F.R. § 36.402(c)."

No. CV 14-2980, 2016 WL 852458, at *4 (E.D. La. Mar. 4, 2016)(emphasis added).

"Even a relatively inexpensive or localized modification may…so fundamentally change the use of a facility that we would regard it as an alteration, particularly if it affects the purpose, function…of the facility." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008).

Here, Centro failed to comply with the alteration requirements of the ADA when, in 2015, the international symbol of accessibility was added to the signage on the physical bus stops in Utica, along with the words "ACCESSIBLE STOP". R.A.76. Similarly, the Centro bus maps/schedules were modified in 2019 to include the international symbol of accessibility on nearly every bus stop. R.A.76. Having altered the nature of the bus stops, Centro was obligated to ensure that the modified stops were accessible. *Roberts*, 542 F.3d at 370. In *Frame v. City of Arlington* the Fifth Circuit held that "when a city decides to build or alter a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II." 657 F.3d 215,

230-31 (5th Cir. 2011).[1] Just as the failure to make a sidewalk accessible constitutes discrimination, the failure make bus stops accessible also constitutes discrimination.[2]

As stated above, the district court did not engage with _any_ of said argument and this Court should remand for factual finding and ruling on Mr. Woods' alteration standard claim.

### 3. <u>The Access Board Webpage Cited by Centro is Non-Binding and Inapplicable.</u>

Centro misrepresents an Access Board webpage (the "Webpage") created by two individuals who are not government employees of the Access Board—Jerry Markesino and Michele Ohmes—that appears on the Access Board's website. Centro claims that because the Webpage says "the placement of a bus stop sign alone does not require other site improvements…" that means this was "specifically determined" by the Access Board. Appellee's Brief at 10. The Webpage is not the law, is not regulatory material, and should not inform this Court's decision on the law. Further, even if considered by this Court, the Webpage is not applicable here as this is not a case where "placement of a bus stop sign alone" occurred. Defendants

---

[1] _Frame_, 657 F.3d at 228 ("When a newly built or altered city sidewalk is unnecessarily made inaccessible to individuals with disabilities, those individuals are denied the benefits of safe transportation and a venerable public forum.").

[2] 49 C.F.R. §37.43(a)(1) (requiring that the altered portion of a facility be readily accessible to and usable by individuals with disabilities to the maximum extent feasible).

designated the stops as accessible in 2015 through new signage that included the words "ACCESSIBLE STOP." R.A.76.

The ADA and the applicable regulations are the law in this matter. Regulatory guidance materials come from the Department of Justice and the Federal Transit Authority. In contrast, the Access Board is an independent federal agency charged with "develop[ing] advisory information for, and provid[ing] appropriate technical assistance to, individuals or entities with rights or duties" under Titles II and III of the ADA and establishing "minimum guidelines and requirements for the standards issued" by Titles II and III of the ADA. 29 U.S.C. § 792(b)(2), (3)(B). Guidelines proposed by the Access Board do not carry the force of law until reviewed by the Department of Justice. *Sarfaty v. City of Los Angeles*, No. 2:17-CV-03594-SVW-KS, 2020 WL 1078804, at *5 (C.D. Cal. Feb. 7, 2020) (declining to consider the Proposed Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way ("PROWAG") published by the Access Board because "they have not yet been adopted by the DOJ, the agency responsible for implementing ADA regulations").

Courts defer to an agency's interpretation of its own "genuinely ambiguous" regulations. *Kisor v. Wilkie*, —— U.S. ——, 139 S. Ct. 2400, 2414–15, 204 L.Ed.2d 841 (2019); see also *Miller v. California Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir. 2008). As with many rules, however, there are exceptions. *Kisor*, 139 S. Ct. at 2414. Courts do not defer to the agency's interpretation unless it is "reasonable"—

9

that is, the interpretation "must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16; *see also Miller*, 536 F.3d at 1028. Additionally, the agency's interpretation must be "made by the agency" and "must in some way implicate its substantive expertise." *Kisor*, 139 S. Ct. at 2416–17. Finally, the "agency's reading of a rule must reflect fair and considered judgment" to warrant deference. *Id.* at 2417 (internal quotation marks and citation omitted).

Only the DOJ or FTA would be entitled to deference, not the Access Board. *Sarfaty*, 2020 WL 1078804, at *5. Even if the Access Board was entitled to deference, the Webpage is not entitled to any deference. Centro improperly claims that the publication of the Webpage means that the Access Board has "specifically determined" that the placement of a bus stop alone does not require other site improvements. Not so. The Webpage was not "made by the agency"—it is the writings of Mr. Markesino and Ms. Ohmes published to the Access Boards' website. Instead of saying "by the Access Board," or "endorsed by the Access Board," the document says, "by Jerry Markesino, PE, Otak, Inc.; and Michele Ohmes, APWA[.]" Moreover, the two authors are representing their own organizations, not the Access Board.[3]

---

[3] After the initials PE, Mr. Markesino put "Otak, Inc." which is a private company. Ms. Ohmes, who does not have any stated degrees, put APWA, which appears to stand for the American Public Works Association.

Given the Webpage's provenance, it can hardly be said to represent the Access Board's "substantive expertise." There is no reason to believe that the authors have "substantive expertise" to opine on what, as a legal matter, constitutes an "alteration" to a bus stop.

Finally, even if the Court were to examine the substance of the Webpage, it bears no relation to the instant facts. The Webpage states "placement of a bus stop sign alone" does not require other improvements. Appellee's Brief Addendum at ADD.019-020. Centro did not erect signs that simply say "bus stop." Instead, Defendants officially re-designated the stops accessible with the explicit words "ACCESSIBLE STOP" and included that designation on the signs and system maps. Centro's liability under Mr. Woods' alteration standard claim flows from Centro's change to the nature of the bus stops through said accessibility designation.

## III.  PROGRAM ACCESS - PARATRANSIT

In his opening brief, Mr. Woods argued that the district court failed to properly evaluate Mr. Woods' case within the contours of the Supreme Court's ruling in *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1988). Centro does not engage in any meaningful discussion of *Yeskey* and, instead, misstates the law by injecting new language into the applicable statute. Centro then attempts to bolster its position by citing other district court rulings that also ignore *Yeskey*.

11

1. **Centro Fails to Address the Supreme Court Case of *Yeskey* and, Instead, Adds Language to the Text of 42 U.S.C. § 12148.**

In his opening brief, Mr. Woods argued that under the Supreme Court case of *Yeskey*, <u>each</u> program, service, or activity offered by a public entity must each be accessible. Centro breezes past this argument and completely fails to engage with the Supreme Court's holding. Instead, yet again, Centro misrepresents the law when it claims 42 U.S.C. 12148(a)(1) "states that a public transportation system must be viewed in 'in the entirety.'" Appellee's Brief at 20. The law actually states:

> "With respect to existing facilities used in the provision of designated public transportation services, it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of title 29, for a public entity to fail to operate **<u>a</u>** designated public transportation **<u>*program or activity*</u>** conducted in such facilities so that, when viewed in the entirety, **<u>*the program or activity*</u>** is readily accessible to and usable by individuals with disabilities."

*See* 42 U.S.C. 12148(a)(1) (emphasis added).

Contrary to Centro's claim, "public transportation system" does not appear in the statute. Instead, it says "a … program or activity" and requires that "the program or activity" be readily accessible to and usable by individuals with disabilities.

This language parallels the statutory language the Supreme Court evaluated in *Yeskey*, which resulted in the court finding that a prison can provide many "medical services … any of which disabled prisoners could be excluded from participation in." 524 U.S. at 210.

The clause "operate *a ... program or activity*" followed by the requirement that "*the program or activity*" be readily accessible to and usable by individuals with disabilities does not leave room for ambiguity. As Ms. Woods pointed out in his opening brief, a plain reading of the phrase "a designated public transportation program or activity," clearly prohibits discrimination as to *any* program or activity is prohibited. Centro made no attempt to rebut Mr. Woods' argument that use of the word "a" must be read as equivalent to the words "any" or "every." Instead, Centro resorts to misstating the law to claim it applies to "transportation systems."

## 2. <u>The District Court Cases Cited by Centro Misapplied the Law.</u>

Centro cites several other district court cases that also failed to evaluate whether, under *Yeskey*, a transportation provider can rely on paratransit as a substitute service. For example, Centro cites *Neal v. Metro Reg'l Transit Auth.*, 2019 U.S. Dist. LEXIS 133707 (N.D. Ohio 2019) for the proposition that a transit agency does not have to make its fixed-route service accessible because of paratransit. Notably absent from the *Neal* opinion was any discussion of: (1) the Supreme Court holding of *Yeskey*, under which each service must be meaningfully accessible; (2) the purpose of paratransit and whether the defendants' paratransit service was, in fact, the same as the fixed-route service; and (3) any discussion of the reasonable modification or alteration requirements of the ADA.

*Neal's* failure to discuss *Yeskey* makes it wholly unreliable. Furthermore, the *Neal* opinion assumed—with no factual development—that paratransit and fixed-route service are identical services (they are not). For the sake of brevity, Mr. Woods does not dissect each of these remaining district court cases. None are binding on this Court, and none addressed the legal arguments advanced by Mr. Woods. As such, they simply aren't useful.

### 3. <u>Paratransit is Limited to Severely Disabled Persons.</u>

Centro asserts that paratransit is "by no means limited to severely disabled persons" and that it is "undisputed" that Mr. Woods would be eligible to use Centro's paratransit service. This simply isn't in accord with the text of the regulations.

In support of its argument, Centro provides a general citation to 49 CFR § 37.123 but fails to cite any of the sub-part. In contrast, in his opening brief, Mr. Woods evaluated the various sub-parts. Paratransit eligibility is set forth in 28 C.F.R. § 37.123(e). Under the text of the regulation, eligibility turns on the abilities of the individual, not on whether the transportation entity has abdicated its obligation to make its fixed route service accessible.

Unable to grapple with the text of the regulation, Centro provides a citation to a 46-page span of an FTA "Circular," which Centro states, "clearly provides that qualifying individuals with mobility impairments are eligible for paratransit services." Appellee's Brief at 28. The Circular says that § 37.123(e)(2), "applies to

14

a stop at which drivers can deploy lifts or ramps but individuals cannot use them because the stop itself is inaccessible." SA-915. The Circular also states that an individual may be entitled to "conditional eligibility" based on inaccessible facilities, including "stops [that] are not accessible[.]" SA-921. Notably, however, the FTA Circular does not cite any of the language from § 37.123(e)(2) where, under the text of the regulation, other than the reference to § 37.167(g) (which pertains solely to inability to deploy a ramp or temporary conditions that make the stop unsafe for all passengers), an individual would be eligible based on an entity's failure to make its bus stops accessible. The same applies to purported "conditional eligibility."

The Circular is not the law, and the text of 28 C.F.R. § 37.123(e) is not ambiguous. The Supreme Court made it clear "[i]n *Mortgage Bankers*, [] that interpretive rules, even when given *Auer* deference, do *not* have the force of law." *Kisor*, 139 S. Ct. at 2420. "There can be no thought of deference unless, after performing that thoroughgoing review, the regulation remains genuinely susceptible to multiple reasonable meanings and the agency's interpretation lines up with one of them." *Id*. at 2419. In fact, the Circular clearly states: "This Circular does not alter, amend, supersede, or otherwise affect the DOT ADA regulations themselves or replace the need for readers to reference the detailed information in the regulations." *See* SA-912.

15

Centro makes no attempt to argue that the eligibility sub-parts of § 37.123(e) are "genuinely susceptible to multiple reasonable meanings" and that the FTA's interpretation in the Circular "lines up" with one of various multiple readings of an eligibility sub-part found in § 37.123(e). In contrast, as Ms. Woods pointed out in his opening brief, the eligibility requirements of § 37.123(e) are very specific and do not state that an individual is eligible to use paratransit if the bus stops on the fixed route system are inaccessible. The eligibility requirements found in § 37.123(e) are not ambiguous and, thus, the language in Circular pertaining to eligibility based on inaccessible bus stops or is not entitled to deference. Under the regulations, Centro's failure to make its bus stops accessible does not render Mr. Woods eligible for paratransit.

## IV.  PROGRAM ACCESS – PURPORTED "ALTERNATIVE" PICK UP SITES.

Centro's argues that sufficient "alternative" pick up and drop off sites are available in active driveways and on curb cuts, but this argument fails legally and factually.

### 1.  The District Court Failed to Adequately Evaluate This Issue

In his opening brief, Mr. Woods argued that the district court's holding—that Centro's use of driveways and curb cuts pick up sites was a reasonable accommodation—was insufficient as the district court holding was relegated to a footnote and failed to address Mr. Woods' argument that Centro's purported

"alternative" pick up sites are inaccessible and unsafe. Centro completely fails to address this argument, waiving it.

**2. <u>Centro's Attempt to Re-Write the Factual Narrative is Unavailing.</u>**

Centro's expert grossly exaggerated when he claimed that, "I saw boarding and alighting spots in close proximity to every stop that could be used by many passengers with disabilities." Appellee's Brief at 7. In his deposition, Centro's expert admitted that he did not actually inspect any bus stops to see if they were accessible. Centro's expert agreed that the ADA regulations prohibiting excessive slopes and changes in level for bus stops exist for the safety of wheelchair users. R.A.88. For individuals with disabilities, "the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945-46 (9th Cir. 2011) (en banc). Despite this knowledge, Centro's expert admitted in his deposition that he did not physically go out to the bus stops in question and take measurements of those boarding and alighting areas to determine if those spots were safe (*i.e.*, did not contain excessive slopes or were free from uneven changes in level). R.A.87. Centro's expert may have "eyeballed" the boarding and alighting spots, but he did not do anything to determine if those spots complied with the ADA or were safe.

In the ADA case of *Disabled in Action v. City of New York*, the district court excluded an expert where he used an "eye test," failed to adhere to any reliable measurement technique, and speculated as to some aspects of the facilities. 360 F. Supp. 3d 240, 245-47 (S.D.N.Y. 2019). Here, Centro's "expert" took no measurements, relied exclusively on an "eye test," and completely failed to substantiate the assumptions underlying his report. By contrast, Mr. Woods' expert measured the bus stops and conclusively established that **ninety-one (91%) percent** of the bus stops surveyed were non-compliant. R.A.85-86. Centro's "expert's" claims should be afforded no weight whatsoever.

### 3. The ADA Regulations Do Not "Specifically Endorse" the Use of Driveways and Curb Cuts in Lieu of Making Bus Stops Accessible.

Yet again, Centro misstates the law when it claims "Federal regulations specifically endorse" its practice of dropping off and picking up wheelchair users in driveways and curb cuts in lieu of making bus stops accessible. Appellee's Brief at 33. Centro cites no regulation stating (or even implying) that transit entities need not make their bus stops accessible if the entity proclaims that individuals can board or alight in driveways or on curb cuts.

Unable to cite any on-point regulation, Centro pulls an example from the Circular that states that it would reasonable for a transit entity to slightly adjust the boarding location where *temporary conditions* such as "sidewalk construction or snow prevents the individual from board the bus from the bus stop." See Appellee

18

Brief, citing SA-735. Based on this example, Centro argues, *ipso facto*, that it need not make **any** of its bus stops accessible and that wheelchair users can simply board or alight in driveways or on curb cuts.

The Circular clearly references *temporary conditions*, such as sidewalk construction or snow. When construction or inclement weather is present, all riders must make adjustments. That makes sense. But nothing in the Circular suggests that transit agencies can willy-nilly ignore the ADA requirements pertaining to landing pads by insisting that individuals with disabilities board and alight in driveways or on curb cuts.

### 4. **Mr. Woods' Experience at the McDonald's Was Not "Successful."**

Mr. Woods testified regarding his experience as a passenger on a Centro bus to McDonald's. R.A.50. He was dropped off on the driveway of the McDonalds instead of at the bus stop. R.A.50. Because of the steep slope of the driveway, he was not able to get out of the driveway without the help of his friend. R.A.50. This is an injury-in-fact.

Yet again, Centro misrepresents the facts when it recounts Mr. Woods' visit to McDonalds. It claims, "Mr. Woods' real complaint is not with the flat location where he was dropped off but with the allegedly difficult slope leading from that location to McDonalds." Appellee's Brief at 36. To be clear, none of this is true. There is nothing in the record to support Centro's claim that Mr. Woods was dropped

19

off on a "flat location." Centro simply made that up out of whole cloth. Mr. Woods clearly testified that he was dropped off "in a driveway" and that his friend had to push him up a hill from the driveway. R.A.134. Centro claims that a photograph shows that Genesee Street is "as flat as a road can get," but (1) Mr. Woods was not dropped off on the road; and (2) as stated above, eyeball testing is speculative and inadmissible.

Centro goes on to yet again wrongly claim that Mr. Woods would have had to scale the driveway whether he was dropped off at the inaccessible bus stop or not. Appellee's Brief at 36. There is nothing in the record to support this theory. Furthermore, this claim is irrelevant as an adjacent business' compliance or non-compliance with accessibility standards has no bearing on Centro's obligations and liability here.

## V.  **REASONABLE ACCOMMODATION.**

Centro's arguments concerning Mr. Woods' reasonable accommodation claim are redundant of the program access claim. As those arguments have been addressed in the opening brief, and above, Mr. Woods does not restate his argument.

In one regard, however, Centro's argument warrants response. Centro argues that there is "***no*** requirement to provide a reasonable accommodation by changing the advance reservation requirement[.]" Appellee's Brief at 39. Mr. Woods has never

argued that Centro is obligated to change its advance reservation requirement for its paratransit service.

Mr. Woods acknowledges that paratransit service is distinct and different from fixed-route bus service in many ways: It is point-to-point (which is great for individuals with severe disabilities) but it takes longer, is segregated, and requires advance reservation. Mr. Woods does not argue that Centro is obligated to change how it provides paratransit service. Instead, Mr. Woods argues that Centro is obligated to take reasonable steps so that its fixed route bus service is made accessible to wheelchair users.

Paratransit was never intended to service as a wholesale substitute for accessible, fixed-route service. The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (the "integration mandate"). Centro is the entity attempting to force Mr. Woods into using its non-integrated paratransit service. It is unreasonable to force Mr. Woods to use paratransit—a service segregated from the general public, with different service hours and reduced spontaneity—when a reasonable accommodation exists. All Centro needs to do is make its bus stops accessible as per the ADA.

## VI.   **STANDING.**

The district court held, "it is clear from the allegations in Plaintiff's complaint that he has alleged an injury-in-fact because he was aware of a barrier to accessing Defendants' bus system and avoided using the bus system because of that barrier. The Court also finds that Plaintiff has sufficiently alleged that his injury-in-fact is caused by Defendants' failure to provide accessible bus stops and would be remedied by a decision in his favor." R.A.23.

Centro attempts to attack Mr. Woods' standing by disbelieving his deposition testimony. Centro dismissively states, "Apart from Woods' conclusory assertions that he has tried to use various bus stops and would like to do so in the future there is simply no evidence to show that Woods truly intends to use Centro's bus system." Appellee's Brief at 44. Centro is free to disbelieve Mr. Woods' testimony but Centro is not free to re-write the Federal Rules of Evidence.  Mr. Woods' testimony is obviously "evidence." Furthermore, it is unclear what "evidence" Mr. Woods is supposed to provide to buttress his claim that wants to ride the bus.

Finally, Centro strains to somehow argue that Mr. Woods' history of other ADA litigation means he has no real intent to use Centro's busses. Mr. Woods' history of asserting his rights against other entities that violate the ADA has no bearing on the instant suit because the enforcement of the ADA has been delegated to civil litigants like Mr. Woods.

22

## 1. **Mr. Woods has Suffered an Injury-in-Fact.**

The district court found that Mr. Woods has standing. Despite this, Centro complains that Mr. Woods has no "evidence" other than his testimony that he was injured. Centro argues that Mr. Woods cannot remember the exact dates that he was injured. However, Centro cites no caselaw that Mr. Woods must meet these invented standards because there is no caselaw to cite.

As was clearly stated in Mr. Woods' opening brief, Mr. Woods is deterred from using the Utica fixed route bus system because of the lack of landing pads and he is put in danger by being dropped off on active commercial driveways or is physically unable to access the bus stops. Mr. Woods has actual notice that most of the bus stops in Utica are not accessible based on his prior attempts to access bus stops that lack an accessible landing pad. Mr. Woods summed the problem up succinctly:

> "There's no landing pad…you have to have one there. There's nothing there but danger. That's what you get from all these bus stops. That's why I can't continue on getting on the bus stop. If the bus stops was correct for me to get on there, I would continue on…the bus stops are like distant islands. You can't get to it." R.A.82.

A. The McDonalds Experience

Centro claims that Mr. Woods was not "injured" when he used a Centro bus to try to get to McDonald's. The details of this injury are explained in detail above.

23

Despite this account, Centro dismisses this injury-in-fact as "just one occasion" as though the ADA requires multiple injuries-in-fact to confer standing. Not so.

B. <u>The Experiences at Bus Stops Where Mr. Woods was Deterred.</u>

As is also described above, Mr. Woods identified bus stops that do not contain landing pads that deterred him from trying to catch the bus at those locations. Mr. Woods' expert documented that ninety-one (91%) percent of the bus stops surveyed were non-compliant. R.A.85-86. Faced with this overwhelming evidence, Centro faults Mr. Woods for not recalling the exact dates he encountered these noncompliant bus stops. Centro cites no caselaw for the proposition that one has not suffered an injury-in-fact if a plaintiff cannot recall the exact date the injury took place. Centro goes on to argue, "Woods could provide no real information about his alleged attempts, but simply asserted that the stops lacked landing pads." Appellee's Brief at 45. Yet again, Centro cites no caselaw that an ADA plaintiff must provide "real information" and how the Court is supposed to distinguish real information from information that is not real.[4]

---

[4] While Mr. Woods cannot recall the dates he visited certain bus stops, he does remember why he visited them. Mr. Woods stated that he attempted to use the bus stop at the 900 block of Matthews Avenue "because that's where my cousins stay at." R.A.135. Mr. Woods stated that he attempted to use the bus stop at 350 Leland Avenue to get to his pharmacist. R.A.137. Neither the ADA regulations nor the caselaw require a plaintiff to explain why he visited a place of public accommodation. **Of course, Mr. Woods clearly visited those bus stops to catch the bus.** It is irrelevant why he was at that particular bus stop or where he was going, etc.

## 2. __Mr. Woods Intends to Use Centro's Fixed Route Bus System in the Future.__

As stated above, Centro explicitly questions Mr. Woods' intent to us the Centro fixed route bus system when it claimed, "Apart from Woods' conclusory assertions that he has tried to use various bus stops and would like to do in the future, there is simply no evidence to show that Woods truly intends to use Centro's bus system." Appellee's Brief at 44. This unreasonable demand for non-testimonial "evidence" completely ignores that when asked the question, "If these bus stops were ADA compliant and had the proper landing pads, would you be using these bus stops?" Mr. Woods replied:

> Oh, yes. I would love to. I would love to get around on the bus stops, you know? Theres nothing wrong with getting on the bus, taking the bus. I would love to get to them, but it's scary. I know too much about the bus stops and how they are supposed to be, and that's dangerous. That's dangerous for anyone. I mean, it's dangerous for me as myself, an individual…" R.A.145.

Mr. Woods has explicitly indicated that he wants to ride the Centro buses in Utica. The Second Circuit has held that deterrence constitutes an injury under the ADA. *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188 (2d Cir. 2013). It is unclear what additional evidence Centro thinks Mr. Woods is obligated to provide to bolster that he desires to use the bus stops but is deterred from doing so by the widespread physical barriers. We're talking about the public bus here. There are no

tangible documents that Mr. Woods could submit to bolster his claim that he wants to ride the bus.

### 3. Defendants' Attack on Mr. Woods' Litigation History is Legally Insufficient. Further, Mr. Woods' Litigation History is Consistent with the Structure of the ADA.

Centro makes the strange argument that because Mr. Woods has filed other ADA lawsuits he "has no motivation to actually use Centro's system." Appellee's Brief at 48. As a threshold matter, Centro's attack on Mr. Woods' litigation history is legally baseless. A plaintiff's intent to visit unrelated places he previously sued "says little" about his intent to visit the specific facility at issue. See *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023). Nor does a plaintiff's ability to recall details of lawsuits against facilities, without an opportunity to refresh their recollection, shed light on their intent to return to the facility at issue. *Id.*

In support of its effort to besmirch Mr. Woods based on his litigation history, Centro cites one district court case: *Kennedy v. Floridian Hotel, Inc.*, 2018 U.S. Dist. Lexis 207984 (S.D.Fla. Dec. 7, 2018). However the plaintiff in that case was a "tester who visits various places of accommodation and their websites to ascertain whether they are in compliance with the ADA." The *Kennedy* plaintiff filed suit as a "tester" and did not visit the hotel; rather she only visited the hotel's website and sued over the accessibility of the website. See *Kennedy v. Floridian Hotel, Inc.*, U.S.D.C. for the S.D. of Florida, R. Doc. 53, pp. 1-2. The *Kennedy* court found that "in the past

six months in this district alone, Plaintiff has brought a horde of suits against properties' websites for failure to comply with section 36.302(e) (in many cases, including this one, the same property multiple times), asserting nearly boilerplate intentions to return to the subject website in each case." *Id*. at 18. The court in *Kennedy* then went onto list seventeen (17) "boilerplate" lawsuits the plaintiff filed pertaining to website and/or online reservation systems over a six-month period. *Id*. at 18-20.

While Mr. Woods has filed fifteen lawsuits in the Northern District of New York over the span of five (5) years, those suits pertained to physical places of accommodation where he personally encountered barriers to access – all within miles of his home. Furthermore, his lawsuit against Centro is his sole lawsuit against a transportation entity regarding inaccessible bus stops. The instant lawsuit has nothing to do with his other ADA lawsuits against physical public places of accommodation and surely cannot be deemed "boilerplate."

In any event, attacking a civil rights plaintiff over their litigation history is counter to the statutory structure of the ADA. The Ninth Circuit has explained that "most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled.... For the ADA to yield its promise of equal access for the disabled, it may indeed be necessary and desirable for committed individuals to bring serial litigation advancing the time when public

27

accommodations will be compliant with the ADA." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)). While lawsuit can also be brought by the Attorney General, said agency has limited resources, and thus "private suits by necessity represent the main tool for ensuring compliance with Congress's intent in passing the ADA." *Kelly Johnson, Note, Testers Standing Up for Title III of the ADA*, 59 CASE W. RES. L.REV. 683, 710 (2009). To the extent Centro has an issue with the private-enforcement nature of the ADA, its quibble is with Congress—not Mr. Woods.

## VII.  **CONCLUSION**

The district court's opinion should be reversed in its entirety. Mr. Woods further requests that this Court hold that there is a genuine issue of material fact as to Mr. Woods' reasonable accommodation claim and instruct the district court to evaluate Mr. Woods' alteration and program access claims in light of the instant opinion.

Respectfully Submitted,

(signature block on following page)

By:/s/ Garret S. DeReus
**BIZER & DEREUS, LLC**

Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999
F: 504-948-9996
*Counsel of Record for*
*Plaintiff/Appellant, Travis Woods*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 26th day of May, 2023, service by Electronic

Notice through the CM/EF system was made upon all counsel of record. I further

certify that on this same date, a copy of this brief was served on the counsel of record

for Defendants-Appellants via Electronic Mail.

By:/s/ Garret S. DeReus
**Garret S. DeReus**

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because it contains 6,781 words, as determined by the word-count function of excluding the parts of the brief exempted by Fed. App. P.32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). Because this brief has been prepared in a proportionally spaced typeface using Microsoft word in 14-point Times New Roman.

By:<u>/s/ Garret S. DeReus</u>
**Garret S. DeReus**

Dated: May 26, 2023

30