# United States Court of Appeals
# For the Second Circuit

August Term 2023

Argued: December 12, 2023
Decided: June 10, 2024

No. 22-2629

TRAVIS WOODS,

*Plaintiff-Appellant,*

*v.*

CENTRO OF ONEIDA, INC., CENTRAL NEW YORK REGIONAL TRANSPORTATION
AUTHORITY,

*Defendants-Appellees,*

CITY OF UTICA,

*Defendant.*[*]

Appeal from the United States District Court
for the Northern District of New York
No. 20-cv-539, Frederick J. Scullin, Jr., *Judge.*

Before: CALABRESI, SULLIVAN, and PÉREZ, *Circuit Judges.*

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Plaintiff Travis Woods appeals from a judgment dismissing his claims for damages and injunctive relief under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act against the Central New York Regional Transportation Authority and its subsidiary Centro of Oneida, Inc. (collectively, "Centro"), which together run the public bus service in Oneida County. Woods, who is paralyzed from the waist down, argues that the district court (Scullin, Jr., J.) erred in granting summary judgment to Centro on his claims that Centro discriminated against him in violation of Title II of the ADA and the Rehabilitation Act by failing to provide wheelchair-accessible bus stops. Specifically, Woods contends that the district court failed to address his alteration claim under 42 U.S.C. § 12147 and his program-access claim under 42 U.S.C. § 12148. Woods further asserts that Centro violated 49 C.F.R. § 37.5(i)(3) by not providing reasonable accommodations to him. We disagree. Woods's section 12147 claim fails as a matter of law because he has not alleged that the altered portions of Centro's bus stops were inaccessible. Woods's section 12148 claim fails because no reasonable factfinder could conclude that Centro's bus service was not readily accessible to individuals with disabilities. Finally, Woods's section 37.5(i)(3) claim fails because Woods has not established that any modifications to Centro's policies, practices, or procedures were necessary to avoid discrimination or to provide program access. We therefore AFFIRM the judgment of the district court.

AFFIRMED.

ANDREW D. BIZER (Garret S. DeReus, *on the brief*), Bizer & DeReus, LLC, New Orleans, LA, *for Plaintiff-Appellant*.

W. BRADLEY HUNT (Christian P. Jones, *on the brief*), Mackenzie Hughes LLP, Syracuse, NY, *for Defendants-Appellees*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiff Travis Woods appeals from a judgment dismissing his claims for

damages and injunctive relief under the Americans with Disabilities Act (the

"ADA") and the Rehabilitation Act against the Central New York Regional

Transportation Authority and its subsidiary Centro of Oneida, Inc. (collectively, "Centro"), which together run the public bus service in Oneida County. Woods, who is paralyzed from the waist down, argues that the district court (Scullin, Jr., J.) erred in granting summary judgment to Centro on his claims that Centro discriminated against him in violation of Title II of the ADA and the Rehabilitation Act by failing to provide wheelchair-accessible bus stops. Specifically, Woods contends that the district court failed to address his alteration claim under 42 U.S.C. § 12147 and his program-access claim under 42 U.S.C. § 12148. Woods further asserts that Centro violated 49 C.F.R. § 37.5(i)(3) by not providing reasonable accommodations to him. We disagree. Woods's section 12147 claim fails as a matter of law because he has not alleged that the altered portions of Centro's bus stops were inaccessible. Woods's section 12148 claim fails because no reasonable factfinder could conclude that Centro's bus service was not readily accessible to individuals with disabilities. Finally, Woods's section 37.5(i)(3) claim fails because Woods has not established that any modifications to Centro's policies, practices, or procedures were necessary to avoid discrimination or to provide program access. We therefore affirm the judgment of the district court.

# I. BACKGROUND

Woods is a lifelong resident of the City of Utica who is paralyzed from the waist down and uses a wheelchair for mobility. Centro is a public entity that operates a fixed route transportation system as defined in the ADA. *See* 42 U.S.C. § 12131(1) (defining "public entity"); 42 U.S.C. § 12141(3) (defining "fixed route system").

In April 2020, Woods sent a letter to Centro alleging that its bus stops were inaccessible to wheelchair users and demanding that Centro "remedy the ADA violations and bring the [bus stop] landing pads into compliance with the requirements, provisions, and regulations of the ADA and the Rehabilitation Act within thirty (30) days." Woods App'x at 79 (internal quotation marks omitted). In response, Centro noted the availability of alternate pick-up and drop-off locations in the vicinity of its bus stops, as well as its policy of allowing courtesy stops anywhere along a bus route. Unsatisfied, Woods brought suit in federal court, alleging that Centro discriminated against him in violation of Title II of the ADA and the Rehabilitation Act. Woods and Centro filed cross motions for summary judgment, and the district court granted Centro's motion, dismissing Woods's complaint. Specifically, the court found that Centro's paratransit service

and its flexible pick-up and drop-off policy were each reasonable accommodations providing meaningful access to Centro's bus service. This appeal followed.

## II. STATUTORY FRAMEWORK: TITLE II OF THE ADA

"The ADA is divided into five separate titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions." *Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 169 (2d Cir. 2013) (internal quotation marks omitted). Title II, which is at issue in this case, is further "divided into Parts A and B: Part A governs public services generally, and Part B governs the provision of public transportation services." *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted).

Part A of Title II prohibits discrimination through its general rule that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Part A defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the

essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2).

In contrast to Title I – which defines discrimination to include "not making reasonable accommodations" for individuals with disabilities, *id.* § 12112(b)(5)(A) – Title II's provision prohibiting discrimination does not itself define that term, *see id.* § 12132. Nor does any other provision of Title II, Part A define discrimination. *See id.* §§ 12131–12134. Lacking a statutory definition, we noted in a case involving a claim brought solely under Title II, Part A that the term "discrimination" as used in Part A "may take its meaning from Title I." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 n.7 (2d Cir. 2003).

Title II, Part B, on the other hand – which governs public entities that provide public transportation services – clearly defines discrimination to include a variety of actions, including: (1) the purchase of new transportation vehicles that are not readily accessible to and usable by people with disabilities, *see* 42 U.S.C. §§ 12142(a), 12144, 12162(a)(2), 12162(b)(2); (2) the operation of a fixed-route transportation system without also providing comparable paratransit services to people with disabilities, *see id.* § 12143(a); (3) the construction of new transportation facilities or stations that are not readily accessible to and usable by

people with disabilities, *see id.* §§ 12146, 12162(e)(1); (4) the alteration of existing transportation facilities or stations if the altered portions are not readily accessible to and usable by people with disabilities, *see id.* §§ 12147(a), 12162(e)(2)(B)(i); (5) the alteration of existing transportation facilities or stations while failing to make the path of travel to the altered area accessible if the alteration affects or could affect the usability of or access to an area of the facility "containing a primary function," *id.* §§ 12147(a), 12162(e)(2)(B)(ii); (6) the failure to operate transportation programs or activities "in [existing] facilities" such that the program or activity, viewed in the entirety, is readily accessible to and usable by people with disabilities, *id.* § 12148(a)(1); and (7) the failure to provide at least one accessible rail car per train to people with disabilities, *see id.* §§ 12148(b)(1), 12162(a)(1). Notably absent from Title II, Part B is any provision requiring public entities to provide reasonable accommodations to individuals with disabilities who request them. *Cf. id.* § 12112(b)(5)(A) (specifying that under Title I it is discrimination not to make a reasonable accommodation barring an "undue hardship").

On appeal, Woods grounds his arguments in sections 12147 and 12148, as well as 49 C.F.R. § 37.5(i)(3), a regulation promulgated by the Department of Transportation under Part B.[1]  We turn to those arguments now.

### III.  STANDARD OF REVIEW

"[W]here the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other," we review a district court's grant of summary judgment *de novo.  Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021) (internal quotation marks omitted).  "We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in [the plaintiff's] favor."  *Id.* (alterations and internal quotation marks omitted).

---

[1] Although Woods also invokes the Rehabilitation Act, every provision of Title II, Part B defining discrimination does so for purposes of both Title II and Section 504 of the Rehabilitation Act. *See, e.g.*, 42 U.S.C. § 12142(a) ("It shall be considered discrimination for purposes of section 12132 of this title and section 794 of title 29 . . . .").  Because "the standards adopted by Title II of the ADA for [s]tate and local government services are generally the same as those required under section 504 of federally assisted programs and activities[,] . . . we treat claims under the two statutes identically" unless a relevant distinction has been identified.  *Henrietta D.*, 331 F.3d at 272.  Since neither Woods nor Centro has identified a relevant distinction between the two statutes, Woods's claims under Title II and the Rehabilitation Act rise and fall together.

## IV. Discussion

On appeal, Woods argues that the district court erred in basing its summary judgment decision solely on "a single, generalized assessment of whether Mr. Woods had 'meaningful access'" to Centro's public bus service. Woods Br. at 12 (quoting Woods App'x at 24, in turn quoting *Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021)). Specifically, Woods contends that the district court should have addressed his separate claim that Centro violated 42 U.S.C. § 12147 when it altered the signage at its bus stops without adding wheelchair landing platforms. He also maintains that the district court erred in not specifically addressing his claim that Centro violated section 12148, a provision that requires public entities operating a public transportation program "in [existing] facilities" to ensure that the program "is readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12148(a)(1). Woods further argues that even if the district court did address his section 12148 argument, it erred in concluding that Centro had complied with that section. Finally, Woods asserts that the district court erred in determining that Centro complied with 49 C.F.R. § 37.5(i)(3), which requires public entities providing transportation services to "make reasonable modifications in policies, practices, or procedures when the

modifications are necessary to avoid discrimination on the basis of disability or to provide program accessibility to their services."  49 C.F.R. § 37.5(i)(3).

Centro, for its part, contends that the district court erred in finding that Woods had standing to bring this suit in the first place, since "[h]e is a serial ADA plaintiff who has taken a Centro bus, at most, one time in his adult life, and who has no serious intention of riding a bus again, no matter what this Court decides." Centro Br. at 12.  We turn to that argument first.

## A.  Standing

"Because standing presents a mixed question of law and fact, we review the [d]istrict [c]ourt's finding *de novo*." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 n.3 (2d Cir. 2013).  To have Article III standing, a plaintiff must show (1) "that he suffered an injury in fact that is concrete, particularized, and actual or imminent," (2) "that the injury was likely caused by the defendant," and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.  In the context of the ADA, we have held that "'deterrence constitutes an injury under the ADA'" and that "[a] plaintiff 'need

not attempt to overcome an obvious barrier' to allege an injury in fact." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 n.4 (2d Cir. 2022) (quoting *Kreisler*, 731 F.3d at 188). For injunctive relief, a plaintiff has suffered an injury in fact if the plaintiff has alleged past injury under the ADA and it is reasonable to conclude that, in the future, the "discriminatory treatment would continue" and the "plaintiff intended to return to the subject location." *Id.* at 74 (internal quotation marks omitted).

Citing *Kreisler*, the district court concluded that Woods "alleged an injury-in-fact because he was aware of a barrier to accessing Defendants' bus system and avoided using the bus system because of that barrier." Woods App'x at 23. While acknowledging that it is sometimes difficult to distinguish between deterrence and a simple lack of interest in using a service, we agree with the district court's determination. Viewing the evidence in the light most favorable to Woods, we conclude that there is sufficient evidence that he would have used Centro buses but for the fact that the bus stops lacked landing pads or were otherwise inaccessible. He has therefore suffered an injury in fact sufficient to confer standing with respect to his damages claims. Because it is reasonable to infer that Woods will continue to be deterred as long as Centro's transit system remains inaccessible, his alleged injury is also sufficient with respect to his claims for

injunctive relief.  Finally, there can be little doubt that Woods's injuries were caused by Centro's alleged non-compliance and are redressable through judicial relief.  *See TransUnion*, 594 U.S. at 423.  We therefore affirm the district court's conclusion that Woods has standing.

### B.  Section 12147:  Alterations of Existing Facilities

Woods first contends that the district court erred in not addressing his argument that Centro violated 42 U.S.C. § 12147(a) when it added  a wheelchair symbol and the words "accessible stop" to its bus stop signs without also installing wheelchair landing pads at those stops.  Though Woods is correct that the district court did not address this argument below, the argument nevertheless fails as a matter of law.  *See Olsen v. Pratt & Whitney Aircraft, Div. of United Techs. Corp.*, 136 F.3d 273, 275 (2d Cir. 1998) ("It is well settled that we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court." (internal quotation marks omitted)).

The first sentence of section 12147(a) provides that alterations to an existing public transportation facility "that affect or could affect the usability of the facility" must be carried out "in such a manner that, to the maximum extent feasible, the *altered portions* of the facility are readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12147(a) (emphasis added).  In its second sentence,

section 12147(a) imposes additional requirements for alterations that affect or could affect the "usability of or access to an area of the facility containing a primary function." *Id.* For such alterations:

> the entity shall also make the alterations in such a manner that, to the maximum extent feasible, *the path of travel to the altered area* . . . [is] readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon completion of such alterations, *where such alterations to the path of travel* . . . *are not disproportionate to the overall alterations in terms of cost and scope* (as determined under criteria established by the Attorney General).

*Id.* (emphasis added). Woods's argument is unconvincing under either sentence.

### 1. Centro's Alteration of Its Signs Did Not Violate the First Sentence of Section 12147

Woods argues that Centro violated the first sentence of section 12147(a). But even if we accept Woods's assertion that changing the content of a bus stop sign is an alteration that "affect[s] or could affect the usability of the facility or part thereof," Woods has presented no evidence that "the altered portions of the facility," – that is, the signs – are not "readily accessible to and usable by individuals with disabilities." *Id.*; *see also* 49 C.F.R. § 37.43(a)(1) (implementing first sentence of section 12147(a)). Simply put, Woods is not arguing that the altered signs are too high or are illegible or are otherwise inaccessible. He instead contends that *other* portions of Centro's bus stops are inaccessible and that the

13

signs are misleading. But because the first sentence of section 12147(a) only requires that the "*altered* portions of the facility" be made accessible, Woods's claim under that provision fails unless he establishes that those other portions of Centro's bus stops were also altered. 42 U.S.C. § 12147(a) (emphasis added).

Woods tries to avoid this quandary by asserting that Centro's changes to its *signs* alone "fundamentally altered the nature of the bus stops," such that the entirety of each bus stop was altered for purposes of section 12147. Woods Br. at 23. He points to a case from the Eastern District of Louisiana in which a district court found that the repainting of general parking spots to mark them as reserved for disabled drivers was enough to establish a violation of an ADA regulation similar to section 12147(a). *See Tatum v. Doctor's Assocs., Inc.*, No. CV 14-2980, 2016 WL 852458, at *4 (E.D. La. Mar. 4, 2016) (discussing 28 C.F.R. § 36.402, which implements Title III of the ADA and applies to public accommodations and commercial facilities). The district court in *Tatum* found that marking a parking spot as reserved for disabled drivers "altered the entire parking space," thereby requiring every aspect of the parking space to be made accessible under section 36.402. *Id.* at *5.

But Tatum's case is markedly different from this one.  In *Tatum*, the signage was self-executing:  by labeling the spots as reserved for disabled drivers, the facility prevented non-disabled drivers from parking in those spots, instantly creating a resource for disabled drivers visiting the facility.  Here, by contrast, Centro's addition of a wheelchair symbol and the words "accessible stop" to its signs – a change presumably intended to communicate that a wheelchair-accessible *bus* serves those stops – in no way altered other components of the stops or the buses serving those stops.  We therefore conclude that the only "altered portions of the facilit[ies]" are the signs, which Woods has never suggested are inaccessible.  42 U.S.C. § 12147(a).

## 2.  Centro's Alteration of Its Signs Did Not Violate the Second Sentence of Section 12147

Woods's alteration claim fares no better under the second sentence of section 12147(a).  That provision states that "the path of travel to the altered area" must also be made accessible if, among other things, the alteration affects the "usability of or access to an area of the facility containing a primary function."  *Id.*; *see also* 49 C.F.R. § 37.43(a)(2) (implementing second sentence of section 12147(a)).  Woods never explicitly invokes the second sentence of section 12147(a) in his briefing, but even if we were to construe his overall argument as doing so, we

would reject that argument for the reasons already stated. Adding a wheelchair symbol and the words "accessible stop" to a bus stop sign without making any other changes to the bus stop or bus cannot be said to change the "usability of or access to an area of the facility containing a primary function." 42 U.S.C. § 12147(a). The bus stops were no more or less accessible after the change in signage than they were before.

At bottom, Woods's argument is that Centro falsely represented that its bus stops were accessible to wheelchair users. He emphasizes that "[b]y designating the bus stops as accessible, Centro affirmatively represented to the public that their stops were of specific dimensions, flat and stable, and free of obstructions." Reply Br. at 5. But while tort law or perhaps other provisions of the ADA not raised in this case may provide relief for such allegedly false advertising, section 12147(a) does not. As already discussed, a section 12147(a) claim turns on the existence of a portion of a facility that is both altered and inaccessible, and Woods has not identified any such portions here.

Because Woods's section 12147 argument fails as a matter of law, we decline to remand the case to the district court for consideration of that claim.

### C.  Section 12148:  Program Access

Woods briefly argues that the district court also failed to address his claim that Centro violated section 12148 by operating an inaccessible bus service.  Section 12148 provides:

> With respect to existing facilities used in the provision of designated public transportation services, it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of title 29, for a public entity to fail to operate a designated public transportation program or activity conducted in such facilities so that, *when viewed in the entirety, the program or activity is readily accessible to and usable by individuals with disabilities.*

42 U.S.C. § 12148(a)(1) (emphasis added); *see also* 49 C.F.R. § 37.61 (implementing section 12148(a)).

Woods's contention that the district court failed to address his program access argument is baseless.  For starters, Woods never cited section 12148 before the district court, instead relying on caselaw to support his argument that Centro failed to provide access to its bus service.  The district court directly addressed Woods's argument as it was then formulated, concluding that Centro's "paratransit service . . . provides [Woods] with 'meaningful access' to [Centro's] transit system as the ADA requires."  Woods App'x at 30.  Furthermore, the district court noted that Centro's practice of giving "bus drivers and passengers flexibility in where to stop the bus for boarding and alighting within the vicinity of the

designated bus stop sign" also "provide[d] [Woods] with 'meaningful access' to [Centro's] transit system." *Id.* at 30 n.7. In no sense did the district court fail to address Woods's program access argument, which he now grounds in section 12148 for the first time.

In the alternative, Woods argues that even if the district court did address his section 12148 argument, it erred in concluding that Centro complied with that section. Again, we disagree.

As a threshold matter, to the extent that Woods's underlying argument is that Centro violated section 12148 by failing to install wheelchair landing pads at its existing bus stops, that argument is squarely foreclosed by section 12148(a)(2).[2] Section 12148(a)(2), titled "Exception," states that section 12148(a)(1) "shall *not* require a public entity to make structural changes to existing facilities in order to make such facilities accessible to individuals who use wheelchairs, unless and to the extent required by section 12147(a) of this title (relating to alterations) or section 12147(b) of this title (relating to key stations)." 42 U.S.C. § 12148(a)(2)

---

[2] Throughout this litigation, Woods has focused on Centro's failure to install accessible landing pads, and he asserted at oral argument that only the installation of those landing pads would make Centro's bus service accessible. *See* Oral Arg. at 17:22–45; *see also id.* at 21:04–40 (arguing that Centro's alleged violation of the program access requirement could be redressed only through structural changes).

(emphasis added).  Because, as discussed earlier, Woods's claim under section 12147(a) fails as a matter of law, and because he does not suggest that section 12147(b) is otherwise applicable here, Centro cannot have violated section 12148 by failing to add wheelchair landing pads to its bus stops.

Of course, Centro could still have violated section 12148 by failing to make necessary *non-structural* changes.  The district court found that Centro did make non-structural changes sufficient to provide meaningful access to its transit system, first in the form of its complementary paratransit services and second through its policy of allowing bus drivers to deviate from marked bus stops when picking up or dropping off disabled passengers to address safety or inaccessibility concerns.  On appeal, Woods argues that Centro's flexible pick-up and drop-off policy is "wholly unreasonable," Woods Br. at 24, and that the district court erred in considering Centro's paratransit service at all since that service is a separate "program or activity" from Centro's bus service, *id.* at 21 (quoting 42 U.S.C. § 12148(a)(1)).

We agree with Woods that the district court erred in considering Centro's paratransit service when assessing the program accessibility of its bus service.  Of course, the district court can hardly be faulted for this error, given that Woods

never cited section 12148 or its requirements. Nonetheless, Woods is right that section 12148 requires accessibility to be evaluated at "the program or activity" level. *See* 42 U.S.C. § 12148(a)(1). And while section 12148 also specifies that the program or activity should be "viewed in the entirety," that clause does not invite consideration of *other* programs. We acknowledge that it may sometimes be difficult to say whether two programs (or activities) are indeed separate programs or are merely subcomponents of the same program. But this is not such a case. The statute itself distinguishes between paratransit and other "designated public transportation services," of which bus service is one. *Id.* § 12143 (requiring public entities operating fixed route transportation systems to provide "paratransit and other special transportation services" sufficient to deliver service comparable to that of the "designated public transportation services" they provide); *see id.* § 12141(2) (defining "designated public transportation" to mean, among other things, bus service). Accordingly, we now hold that paratransit is a separate program or activity from bus service, and that the availability of paratransit should not be considered when evaluating the accessibility and usability of a bus service under section 12148.

Nevertheless, even ignoring Centro's paratransit service, Woods's section 12148 claim still fails. Reviewing the record *de novo* and viewing the evidence in the light most favorable to Woods, we conclude that no reasonable jury could find that Centro's bus service, "when viewed in the entirety," was not "readily accessible to and usable by individuals with disabilities." *Id.* § 12148(a)(1). While Woods certainly claims that *he* has been deterred from using Centro's bus service, the record leaves us with no doubt that the bus service is readily accessible to individuals with disabilities generally, which is what section 12148 requires. Indeed, the record shows that many – if not the entirety – of Centro's buses have either lifts or "kneelers" that make them accessible to wheelchair users, Dist. Ct. Doc. No. 33-13 at 12, and Woods has not argued that those features are "out of order" or otherwise not "'maintain[ed] in operative condition,'" *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 62 (quoting 49 C.F.R. § 37.161(a)). Those accessibility features, combined with Centro's flexible pick-up and drop-off policy allowing wheelchair users to board or alight at street corners, curb cuts, or driveways in the vicinity of a bus stop instead of at the bus stop sign itself, are enough to establish that no reasonable factfinder could conclude that Centro's bus service, viewed in the entirety, is not readily accessible to people with disabilities.

While it is possible that Centro's bus service could be made even more accessible for wheelchair users through structural changes, we again reiterate that section 12148 does not compel such changes here.  The district court therefore did not err in dismissing Woods's section 12148 claim.

### D.  49 C.F.R. § 37.5(i)(3):  Reasonable Modifications

Finally, Woods argues that the district court erred in concluding that Centro complied with 49 C.F.R. § 37.5(i)(3), a regulation promulgated by the Department of Transportation in 2015 that requires public entities providing public transportation services to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability or to provide program accessibility to their services," subject to certain limitations.[3]  49 C.F.R. § 37.5(i)(3); *see also id.* § 37.169.   Once again, we disagree.

As a threshold matter, we must decide whether Woods has a private right of action to enforce section 37.5(i)(3), given that no provision of Title II, Part B defines the failure to make reasonable accommodations as discrimination.   In

---

[3] Although the district court did not directly address section 37.5(i)(3), Woods concedes that the district court's general "'meaningful access' inquiry . . . can be construed as an evaluation of [Woods's] reasonable accommodation claim."  Woods Br. at 25.

*Abrahams v. MTA Long Island Bus*, we held – based on the Supreme Court's decisions in *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001), and *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) – that Title II's private right of action, set forth in 42 U.S.C. § 12133, did not extend to a regulation that "substantively expanded" the statutory provision of Title II under which the regulation was promulgated.  644 F.3d 110, 118 (2d Cir. 2011).  The question we asked in *Abrahams* to identify a substantive expansion of the statute was whether "a public entity may be in full compliance with [the statute's] requirements, while simultaneously violating [the regulation's] requirement."  *Id.* at 119.  Because an entity could have violated the regulation at issue in *Abrahams* without violating the Title II provision under which it was promulgated, we concluded that the regulation did substantively expand the statute and that therefore Title II's private right of action did not extend to it.

Applying this approach to section 37.5(i)(3), we conclude that section 37.5(i)(3) does not substantively expand Title II.  Unlike other regulations promulgated under Title I, section 37.5(i)(3) does *not* define a public entity's failure to provide reasonable modifications as prohibited discrimination.  Instead, section 37.5(i)(3) requires public entities providing public transportation to make reasonable modifications in policies, practices, or procedures "when the

modifications are necessary to *avoid* discrimination on the basis of disability or to *provide* program accessibility." 49 C.F.R. § 37.5(i)(3) (emphasis added). In other words, either discrimination or a lack of program access – each of which *is* prohibited under Title II – is a prerequisite for a section 37.5(i)(3) claim. It follows that whenever section 37.5(i)(3) is violated, a provision of Title II – for example, section 12143 or section 12148 – has been violated as well. Thus, under our test from *Abrahams*, section 37.5(i)(3) does not substantively expand the ADA, and Title II's private right of action extends to that regulation.

But the fact that Woods may have a private right of action to enforce section 37.5(i)(3) is of no moment where, as here, he has not shown that either of the regulation's prerequisites have been met. Woods cannot show that a modification of policies, practices, or procedures was necessary "to avoid discrimination" or "to provide program accessibility" because he never established that Centro's bus service was discriminatory under any applicable provision of Title II, or that Centro failed to provide him with program access as defined in section 12148. 49 C.F.R. § 37.5(i)(3). His section 37.5(i)(3) claim therefore fails as a matter of law for the same reasons that his section 12147 and section 12148 claims failed.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.